No. 12,153.

FEDERAL SURETY COMPANY *v.* WHITE.

(295 Pac. 281)

Decided December 15, 1930. Rehearing denied January 26, 1931.

Mr. WILLIAM E. HUTTON, Mr. B. B. McCAY, Mr. F. R. LILYARD, for plaintiff in error.

Messrs. SMITH, BROCK, AKOLT & CAMPBELL, for defendant in error.

*In Department.*

MR. JUSTICE ALTER delivered the opinion of the court.

R. A. WHITE, defendant in error, hereinafter referred to as plaintiff, brought an action in the district court to recover judgment against the Federal Surety Company, a corporation, plaintiff in error, hereinafter referred to as defendant, and joined with it as codefendants, Ed. Lindsay and P. S. Dolan, doing business as Lindsay and Dolan, hereinafter referred to by name or as subcontractors. The subcontractors filed an answer admitting the allegations of the complaint, and the judgment rendered against them on their confession is not before us for review. Upon the issues being made between plaintiff and defendant, the court appointed a referee before whom the cause was heard. After many days consumed in taking testimony, the referee prepared an elaborate and detailed report containing his findings of fact, conclusions of law, orders and recommendations. The findings being generally in favor of plaintiff, defendant objected thereto, and filed its motion to set them aside, and for a new trial, specifying 108 objections to the referee's re-

port. The court overruled all the objections to the referee's report, denied the motion for a new trial, and rendered judgment in favor of plaintiff and against defendant for the sum of $25,866.66, which judgment included $5,866.66 interest. To review this judgment, defendant prosecutes this writ, assigning 69 errors, which, for convenience in discussion, will be classified generally as follows: (1) The relationship of Albert W. Payne, Jr., and A. W. Payne Agency Company with defendant; (2) the release of defendant from all liability by acts of omission and commission of plaintiff and subcontractors; (3) the allowance of specific items of cost of construction against defendant; (4) the amount of the judgment.

The plaintiff was, on July 30, 1923, awarded a contract with the state of Colorado for the construction of two separate sections of concrete highway east of the city of Pueblo, which sections were officially designated as federal aid project No. 246-A; the agreed compensation to be paid plaintiff for the completed project, in accordance with the plans and specifications, was $78,431.10, which sum was payable in monthly installments upon estimates furnished by the engineer of the state highway department; it being expressly understood, and so stated in the original contract between plaintiff and the state, that only 85 per cent of the monthly estimate should be paid, and 15 per cent should be retained by the state of Colorado until the completion of the project. The plaintiff as principal, and the Aetna Casualty and Surety Company, as surety, executed a bond to the state of Colorado in accordance with the provisions of chapter 155, page 480, Session Laws of Colorado, 1923, which bond will hereinafter be referred to as the statutory bond.

The plaintiff and subcontractors, on August 10, 1923, entered into a written contract wherein the subcontractors undertook and agreed to perform some, if not all, of the work and services which plaintiff had formerly contracted with the state of Colorado to do; the contract between plaintiff and subcontractors being as follows:

"Memoranda of Agreement.

"Memoranda of Agreement, by and between R. A. White of Denver, Colorado, of the first part, hereinafter designated as 'Contractor,' and Ed Lindsay and P. S. Dolan, doing business as Lindsay & Dolan, hereinafter designated as the 'Sub-Contractors,' Witnesseth, that:

"Whereas, the contractor has procured a contract to construct 2.5378 miles of concrete road beginning about six miles east of Pueblo and extending easterly via Santa Fe Trail to end near Vineland, Pueblo County, Colorado, known as Federal Aid Project No. 246-A, upon bid signed July 9, 1925, and contract signed by contractor and the State Highway Department of Colorado, and

"Whereas, the contractor is desirous of sub-letting a portion of the work to the sub-contractors,

"Now, Therefore, in consideration of the mutual agreements hereinafter made, the sub-contractors agree to perform all of the services required of the contractor by his contract with the State Highway Department, in full conformity with said contract, except that the sub-contractors shall not be required to furnish any of the cement, but that the contractor will furnish all cement necessary for the work and deliver the same to the sub-contractors f. o. b. Vineland, Colorado, at $2.74 per barrel net.

"It Is Understood and Agreed, that the said contract, which the sub-contractors agree to perform, consists of the contract proper signed by the contractor herein and by the State Highway Department, the notice to contractors, instructions to bidders, the contractors proposals, and the plans and specifications on file in the office of the State Highway Department at Denver, Colorado, together with such alterations and modifications as may be made in accordance with the provisions thereof.

"The sub-contractors agree that they will receive any cement delivered at Vineland, Colorado, for said project and will properly care for any cement thus delivered, and in the event of the loss of cement after delivery, sub-con-

tractors agree to replace the same; but it is distinctly understood and agreed that the sub-contractors assume no responsibility for the quality of cement delivered and in no way guarantee the same, but that it shall be the duty of the contractor to see that any cement delivered shall meet the full requirements of his contract with the State Highway Department.

"The estimate as to quantities by the project engineer in the employ of the State Highway Department shall be final as between the parties hereto.

"In consideration of the services thus rendered by the sub-contractor the contractor agrees to collect from the State, from time to time, upon the estimates made by the State's Engineer and to forthwith pay to the sub-contractors the amounts thus collected, provided that, where any such estimate shall include cement delivered on the job the contractor shall retain out of any payment made by the State Highway Department that proportion of the estimate which the cement thus delivered bears to the total amount of the estimate, the intention being that the contractor shall collect for all cement furnished by him in conformity with his contract with the State Highway Department, but that the contractor shall bear his proportionate share of any amounts withheld by the State.

"It Is Further Understood and Agreed, that the contractor is to withhold five per cent. of the total amount of the cost of the completed project to the State according to the contractor's bid to the State Highway Department, as his share of the profits in said contract, but that said five per cent. shall not be withheld until final settlement with the State Highway Department is made and the final 15% paid by the State Highway Department; all other sums collected by the contractor from the State Highway Department on this project shall be paid to the sub-contractors except the amount due the contractor for cement furnished.

"It Is Mutually Understood and Agreed, that in the event that the contractor shall fail to pay to the sub-con-

tractors the amount collected, as hereinbefore provided, immediately after receipt of the same from the State Highway Department, then this contract shall become null and void at the option of the sub-contractors and the full amount of all estimates turned in up to the time of the breach by the contractor and for the work then done but not estimated shall immediately become due and payable, whether the contractor has collected for the same or not.

"This contract shall not take effect nor be in force until the sub-contractors shall have furnished and delivered to the contractor a performance and liability bond in form acceptable to said contractor in the penal sum of Twenty Thousand Dollars ($20,000.00) with surety or sureties satisfactory to the contractor.

"It Is Understood and Agreed, that time is the essence of this contract and that the sub-contractors shall complete the job in full conformity with the agreement between the contractor and the State Highway Department.

"In Witness Whereof, the parties hereto have set their hands and seals this 10th day of August, A. D. 1923.

"R. A. White      (Seal)<br>
Contractor<br>
"Ed Lindsay      (Seal)<br>
"P. S. Dolan      (Seal)<br>
"Doing business as Lindsay & Dolan<br>
Sub-Contractors."

In accordance with the provisions of the contract last mentioned, Lindsay and Dolan, as principals, and the Federal Surety Company, as surety, executed a bond, wherein plaintiff was obligee, guaranteeing the due and faithful performance of their subcontract; the defendant being a compensated surety, which, according to the findings of the referee, received a premium based upon the amount stipulated in the contract between plaintiff and the state of Colorado. The bond executed by defendant reads as follows:

"Federal Surety Company. Home Office—Davenport, Iowa.

"W. L. Taylor, Vice President and General Manager.

"Know All Men by These Presents: That we, Patrick S. Dolan and Ed Lindsay, doing business as Lindsay & Dolan, of Denver, Colorado (hereinafter called the Principal), as Principal, and Federal Surety Company, a Corporation established under the laws of the State of Iowa and having its principal office in Davenport, Iowa (hereinafter called the Surety), as Surety, are held and firmly bound unto R. A. White of Denver, Colorado, (hereinafter called the Obligee), in the sum of Twenty Thousand Dollars ($20,000.00) for the payment whereof said Principal binds their heirs, administrators, and executors and said Surety binds itself, its successors and assigns, firmly by these presents.

"Whereas, said Principal has entered into a written contract dated Aug. 10th, 1923, with said Obligee, for certain labor and material as fully set forth in the attached contract, which is made a part of this bond, which provides for this Twenty Thousand Dollar Bond and also for the delivery of cement at $2.74 per barrel net.

"Now, Therefore, the condition of this obligation is such that if the Principal shall indemnify the Obligee against any loss or damage directly arising by reason of the failure of the Principal to faithfully perform said contract, then this obligation shall be void; otherwise, to remain in full force and effect.

"This bond is executed by the Surety upon the following express conditions, which shall be conditions precedent to the right of the Obligee to recover hereunder.

"First: That in the event of any default on the part of the Principal in the performance of any of the terms, covenants, or conditions of said contract, a written statement of the particular facts showing such default and the date thereof shall be delivered to the Surety by registered mail at its office in the City of Davenport, Iowa, promptly and in no event later than ten days after the

Obligee or his representative or the Architect or Engineer, if any, shall become aware of such default; that the Surety shall have the right, at its option, after receipt of such statement, to proceed with or procure others to proceed with the performance of such contract and shall thereupon immediately be subrogated to all the rights of the Principal and of the Obligee, and as such contract is performed, any and all reserves, and all other payments due at the time of said default or thereafter to become due under said contract to be paid to the Principal shall be paid to the Surety, or whomever it may procure to proceed with the performance of said contract, at the same time and under the same conditions as by the terms thereof such payments would have been paid to the principal had the contract been duly performed by the Principal.

"Second: That no claim, suit, or action by reason of any default shall be brought against the Principal or Surety after the expiration of six months next succeeding to the date specified for the completion of said contract, nor shall any recovery be had for damages accruing after that period; that service of writ or process commencing any suit or action shall be made on or before the expiration of said period of six months; that the Principal shall be made a party to any suit or action, and be served with process commencing the same if said Principal can with reasonable diligence be found; that no judgment shall be entered against the Surety in excess of the penalty hereof.

"Third: That the Surety shall not be liable for any damages resulting from strikes or labor difficulties, or from mobs, riots, fire, the elements, or acts of God; or for the repair or reconstruction of any work or materials damaged or destroyed by any of such causes; or the nonperformance of any guarantees of the efficiency or wearing qualities of any work done or materials furnished, or the maintenance thereof or repairs thereto; or for patent infringement; or for damages caused by delay in finish-

ing such contract in excess of 10 per centum of the penalty of this instrument; or for the furnishing of any bond or obligation other than this instrument.

"Fourth: That the Obligee shall faithfully perform all the terms, covenants, and conditions of such contract on the part of the Obligee to be performed, exclusively at the times and in the manner therein specified, and shall also retain that portion of the contract price, which such contract specifies the Obligee shall or may retain until the complete performance by the Principal of all terms, covenants, and conditions of said contract on the Principal's part to be performed; and until the expiration of the time within which liens or notices of liens may be filed, and until the discharge of such liens, if any, and the Obligee shall at all times preserve and exercise all rights provided for his protection by the laws relating to liens of the State wherein said contract is to be performed; and in any event, whether provided in said contract or not, there shall be so retained at least 10% of said contract price.

"Fifth: That no right of action shall accrue upon or by reason hereof, to or for the use or benefit of any one other than the Obligee herein named; that the obligation of the Surety is and shall be construed strictly as one of suretyship only.

"Signed and sealed, this 10th day of August, 1923.

"Lindsay and Dolan   (Seal)
"Ed Lindsay   (Seal)
"P. S. Dolan   (Seal)
"Federal Surety Company, By A. W. Payne, Jr.
"M. F. Hill
Atty. in Fact."

The Federal bond was continued in full force and effect, by written extension thereof, until August 30, 1924.

The plaintiff, in bringing his action against defendant on its bond, alleges that the subcontractors defaulted in the performance of their contract, which default, although known to defendant for some months, was first

learned by plaintiff on August 26, 1924; that defendant refused to complete the project, upon which refusal plaintiff, as required by the terms of his contract with the state of Colorado, immediately started work to complete the project, and in so doing necessarily spent the sum of $22,791.58 in excess of the amount paid by the state, for which amount judgment was sought.

The defendant, in its answer and affirmative defenses, denied the items of damages, and also alleged that plaintiff had failed to serve written notice of the facts constituting the default of the subcontractors; that plaintiff had failed to give defendant an opportunity of completing the project, and in various other respects had violated the provisions of the bond respecting his duty to defendant, and that thereby defendant was relieved of all liability thereunder.

The plaintiff, in replying, denies all new matter in the answer, and pleads waiver and estoppel.

The exhibits offered and admitted in evidence for plaintiff are marked consecutively from A to Z, and from A-A to X-X, inclusive, and the exhibits offered and admitted for defendant are numbered from 1 to 25 consecutively. Plaintiff called eleven witnesses, while defendant called two, and days were spent in their examination. It is therefore impracticable to quote from, and specifically comment upon, all the evidence in this case, but, in the discussion of the errors as classified, we shall call attention to such evidence as we deem pertinent.

1. It is contended by plaintiff that Albert W. Payne, Jr., was general agent of the Federal Surety Company, and therefore had the power to, and did, waive certain conditions and provisions of the bond, while defendant contends that Albert W. Payne, Jr., possessed only such powers and the limited authority given him by virtue of a certain power of attorney filed by the defendant with the commissioner of insurance for the state of Colorado. The power of attorney, in so far as necessary to this discussion, reads as follows: "Provided, however, that

this Power of Attorney does not authorize, or empower, the said Attorney-in-Fact to give consent to any alterations, or changes, in terms, conditions or covenants of said bonds when once executed, nor to any alterations, or changes, in the form or conditions of any Contract, on which this Company is Surety, nor to bind, or in any way commit the said Federal Surety Company to any course or position whatever regarding the adjustment of claims or complaints that may be made thereunder, or in any other connection with any Bond which may be executed by said Company.''

The plaintiff, to support his contention that Payne's authority was not limited by the power of attorney, to which reference has hereinbefore been made, and to establish that Payne was general agent of defendant, offered many exhibits and interrogated several witnesses. One exhibit was a certified copy of an appointment of A. W. Payne, Jr., by the defendant, filed October 28, 1921, in the office of the commissioner of insurance, in which the following appears: ''This is to certify that the Federal Surety Company * * * has appointed and duly authorized A. W. Payne, Jr., * * * General Agent of said Company,'' another exhibit is a letter from defendant dated October 26, 1921, to the commissioner of insurance, in which the following appears: ''We have appointed A. W. Payne, Jr., as our general agent for the State. We are enclosing you herewith an additional check for $2.00 to cover the issue of a license to Mr. Payne.'' The letterhead used by Payne, and the A. W. Payne Agency Company in general correspondence, as well as in communicating with defendant, reads in part: ''Federal Surety Company. Home Office—Davenport, Iowa. The A. W. Payne Jr. Agency Co. General Agents for Colorado.'', and the uncontradicted testimony is, that this last exhibit was furnished and paid for by defendant. The envelopes used by Payne had printed upon them the same advertising matter as the letterhead above, and were furnished and paid for by defendant.

Blotters and advertising matter were furnished by defendant with the same identical printed matter as on the letterheads, and these blotters and other advertising matter were distributed in Denver and the state of Colorado. The policies which were used by Payne and the agency company and which were furnished by defendant contained similar information. Other exhibits were the 1922, 1923, and 1924 city directories, widely circulated in Colorado and elsewhere, and in each of which was contained the following: "Federal Surety Company, Iowa —A. W. Payne Jr. Agency—genl. agts. 204-219 Colo Natl Bank Bldg."

The commissioner of insurance, called by plaintiff, testified that so far as the records in his office disclosed, the appointment of Payne remained unrevoked, and no person other than Payne was appointed agent for the defendant between October 24, 1921, and September 30, 1924.

Payne, called as a witness for plaintiff, testified that all his business correspondence connected with defendant's business, as well as all the files pertaining thereto, had been purloined from his office by someone unknown to him and, therefore, he could not produce the letters and documents themselves; that in all correspondence with him, defendant addressed him as "general agent;" that at some meetings with defendant's officials in Iowa he was addressed as general agent for Colorado, and this term was used by one of the officials in introducing him; that he settled and adjusted some claims for defendant, and undertook, and was required, to keep defendant advised respecting their bond risks and other business in Colorado, and, upon occasion, would advise the officials of the defendant about assisting contractors in financing their contracts, and also his efforts in procuring financial assistance for them; that the letterheads, envelopes, blotters, drafts, insurance policies and other forms used, wherein he was designated as general agent, were furnished by defendant, and that his compensation

was in excess of that paid soliciting agents of defendant; that half of the cost of the office sign reading "Federal Surety Company—A. W. Payne, Jr., Agency Company, General Agents." was paid by defendant, and that officials from the home office of defendant had been in his office after the sign was placed thereon; that his compensation was that of a general agent; and that he and A. W. Payne, Jr., Agency Company were practically one and the same, and from 1921 until sometime in 1924 he was the only person in Colorado in charge of defendant's business.

A general agent is one who is authorized to do all the acts connected with a particular trade, business or employment. *Manhattan Life Ins. Co. v. First Nat. Bank*, 20 Colo. App. 529, 541, 80 Pac. 467; *Great West Min. Co. v. Woodmas, etc., Co.*, 12 Colo. 46, 50, 20 Pac. 771, 13 Am. St. Rep. 204.

It should be remembered that Payne was the general agent of defendant by direct appointment, under date of October 24, 1921, which appointment, unrevoked prior to October 1, 1924, was on file in the office of the commissioner of insurance of the state of Colorado; it should also be remembered that defendant, in its letter of October 26, 1921, to the insurance commissioner, emphatically stated that Payne was its general agent for the state of Colorado. If additional proof was necessary to establish that Payne was general agent for defendant during all the period in question in this litigation, it is to be found in the fact that defendant furnished the letterheads, envelopes, blotters, and other advertising matter, in which Payne was so designated, and in addition paid for one-half the cost of an office sign, in which he was so designated, and in all its correspondence with Payne referred to him as its general agent. The mere fact that the bond in question was signed by Payne under power of attorney, and he was therein designated as an "attorney in fact," did not divest him of his character as a general agent for defendant, in which capacity,

at various times, as disclosed by the evidence herein, he appeared to act and deal with plaintiff and the subcontractors, and in which character he was held out by defendant to the general public.

The referee found, and the trial court approved this finding, that Payne was not limited in his authority, respecting the defendant's business, by the power of attorney offered and received in evidence, and to which reference has hereinbefore been made, but, that during the period involved herein, Payne was the general agent of defendant, and, that during this period, defendant held him out as such to the public. This finding is amply supported by competent evidence, and we expressly approve it. Citation of authorities to support this conclusion would unnecessarily lengthen this opinion.

2, 3. It is contended that defendant is released from all liability on the bond because of certain advances made by plaintiff to the subcontractors, and also because of certain acts of commission and omission of the plaintiff and subcontractors. A careful reading of the briefs of defendant would indicate that everything which plaintiff did should not have been done, and everything which he omitted to do was a vital and necessary prerequisite to his right to maintain an action on the bond. The record is too voluminous and the various items are too numerous to permit a detailed discussion with reference to all of them, but the following will be confined to the more important, and will be illustrative of the questions we are called upon to determine.

The subcontractors became financially embarrassed almost immediately after commencing work, and conferred with Payne in regard to this condition. There is evidence to justify the finding that Payne took immediate steps to relieve this embarrassment by telephoning plaintiff, on several occasions, importuning him to loan or advance money to the subcontractors so that the work might continue, and in these conversations suggested the amount of the loan at $10,000, and offered to protect

plaintiff in the loan or advance. Plaintiff asked that the request for the loan or advance be put in writing, and this Payne promised but failed to do. In discussing his ability to make the loan or advance, plaintiff informed Payne that in order to do so it would be necessary for him to assign the monthly estimates to some finance company, and Payne approved this method. The first amount loaned or advanced by plaintiff was $1,000; the total amount was $4,880.75, all of which was repaid long prior to any action on the bond, and the only purpose of introducing this evidence was to reveal the entire cost of the project, and the source from which the subcontractors received money with which to discharge their legal obligations respecting the subcontract. The money was all used in the performance of their legal obligations on this project, and was loaned or advanced at the instigation, solicitation and request of Payne, who kept the officers of the company informed as to his activities in aiding the subcontractors, and no objection thereto was voiced by them. If this course of procedure was in violation of the terms of the bond, the defendant is in no position to complain, and was not relieved of liability thereunder. The method thus used in relieving the subcontractors of financial embarrassment did not provide sufficient funds with which to ''carry on'' the project, and some other method of raising money was necessary. Payne then consulted with C. W. Mills, an attorney, and told him of the situation, and suggested that he wished Mills to act as trustee in an assignment from the subcontractors, which Mills should draw, ''for the purpose of reimbursing the said Federal Surety Company for any loss which they might sustain by virtue of said bond, or for the purpose of securing funds with which to prosecute the work under the contract * * *.'' The assignment was drawn, and at Payne's suggestion was signed by the subcontractors, and in accordance with the terms thereof the subcontractors executed their promissory note in the sum of $20,000, payable to Mills as trustee,

and secured the payment thereof by chattel and real estate mortgages as well as an assignment of their interest in the monthly payment under the contract. Mills testified that, at Payne's request, he took the assignment "so as to protect the Federal Surety Company and I acted as their trustee." No money could be raised by Payne on the Mill's trustee assignment, and so, on November 17, 1923, at Payne's suggestion, a conference was called between Mills, Dolan, White, Payne and others which resulted in an agreement of that date. Previous to this conference Payne had related to White the futile efforts made to finance the work, and suggested to him that Mills could finance it if his advances were secured by an assignment of the entire monthly estimates. White then suggested that, before such an arrangement could be made, the cement company must be consulted. At the conference on November 17, 1923, a representative of the cement company was present and presumably consented. This last agreement, among other things, provided that the entire monthly estimates should be assigned to Mills, and he should make all payments on account of the project. This agreement was not only approved by Payne, but it was, through his efforts and at his insistence, that it was executed by the subcontractors, and consented to by White. After the date last mentioned, and until the August 25, 1924, estimate, all state warrants on this project were endorsed by White and delivered to Mills, and the payment of all accounts, including the cement item, was handled by Mills himself. It might be remarked that in the last mentioned agreement it was provided that Payne should perform certain services, when requested, and for these was to receive some compensation. In connection with this agreement, we should keep in mind that it therein provided: "if the said Clifford W. Mills can procure someone to purchase the claims against the job that this will be considered a sufficient performance upon his part, * * *." Mills actually procured $14,499.90 with which to purchase

claims and pay accounts properly chargeable against the project, and in doing this, according to his testimony, he had the positive assurance from Payne that defendant would protect him in thus investing his own and funds of others. An action was commenced to recover the amount of money thus advanced by Mills and others, which resulted in a judgment against plaintiff and his surety in the sum of $16,052, which was ultimately settled by White for $14,000, and a claim for this amount is asserted by plaintiff against defendant. There is no serious question raised by defendant as to the amount of this claim nor that the money was actually expended in furtherance of work upon the contract. According to Payne, his actions with reference to the method used in financing this project were reported by him to the officers of defendant, stating that it was all done to protect defendant and "prevent a loss on its bond," and "to save the job." In the summer of 1924, when Mills' funds were exhausted, the Federal Surety Company, through a Mr. Lilyard, advanced money with which to meet the payroll, and requested Mills to take the assignment thereof in blank, which was done. The August 25, 1924, estimate was paid to and kept by plaintiff, as were all subsequent estimates, but these were used by plaintiff in discharging accounts contracted to complete the project, and after the subcontractors had defaulted. The July, 1924, cement account amounted to $11,887.51, upon which Mills paid $6,000, leaving a balance of $5,887.51, which balance was allowed as a claim against defendant. The testimony, with reference to this item, is that when the July, 1924, estimate was paid, the amount thereof was insufficient to pay all the legitimate expenses of the project contracted during the month, and it was necessary to leave an unpaid balance upon some accounts. Mills, who was put in a position by defendant to handle all the money, and dispose of it as he saw fit in payment of the expenses of the project, determined upon the application

of the funds, without advice or consultation with plaintiff.

It was provided in the contract between plaintiff and the subcontractors that, "the contractor is to withhold five per cent. of the total amount of the cost of the completed project to the State according to the contractor's bid to the State Highway Department, as his share of the profits in said contract, but that said five per cent. shall not be withheld until final settlement with the State Highway Department is made and the final 15 per cent. paid by the State Highway Department, * * *." The referee and the trial court construed this to mean that the subcontractors were to complete the project, for which plaintiff had entered into a contract with the state, for 95 per cent of the amount specified in that contract, or in other words, that the subcontractors engaged to complete their contract with plaintiff for 95 per cent of the amount for which he had agreed to do the same work for the state. The provision quoted, although not expressed as clearly as might be, means exactly what plaintiff contends it means, or else it is meaningless in the contract. The referee found, and his finding was approved by the trial court, that this provision obligated the subcontractors to perform their contract for 95 per cent of the price for which plaintiff was to perform his contract with the state, and allowed an item of $4,003.87 for the profits provided in the contract. We can see no reason for disallowing this item, it being in accordance with the terms of the contract which the parties thereto made, and became a condition, for the performance of which the defendant became surety. It is said that the contract clearly specifies plaintiff should be responsible for withholding this percentage, but this was impossible after defendant's agent insisted, and plaintiff acquiesced, in the payment of the entire estimate to Mills, as herein discussed.

Complaint is also made that no notice of default was given, in accordance with the provisions of the bond, and

that defendant was given no opportunity to complete the work after default by the subcontractors. The facts with reference to this are in some respects disputed, but there is evidence which justifies the finding of the referee that on August 26, 1924, the subcontractors defaulted, by permitting a deficit to exist on the project, which they were unable to discharge, and they were unable to complete their contract. On this date, one Lilyard, who had been acting as attorney for defendant with reference to this project, and who had advanced, or procured from defendant, funds with which to meet one payroll, was notified of the default, and he then stated that a large deficit would occur on the project, which defendant would not assume, and that defendant would not indemnify plaintiff, nor reimburse him for any loss whatsoever, which he might be put to in completing the project, and there is also evidence that Lilyard stated that defendant would not undertake the completion of the project, as it might have done under the provisions of the bond. Later, the attorney for plaintiff wrote defendant a letter in which the attitude taken by Lilyard was clearly expressed, and, instead of repudiating Lilyard or his statements, the acknowledgment stated that the letter had been referred to Lilyard for attention. The time limit within which action might be begun on the bond was August 30, 1924, and, if no notice of default was given, and no opportunity to complete the project was afforded defendant, it is its contention that no recovery on the bond can be had. The referee found that, on August 26, 1924, defendant had notice of the subcontractors' default, and, under the provisions of the bond, it could have taken over the completion of the project, but at this time it not only declined this privilege, but expressly disclaimed all responsibility with reference thereto. Written notice was, in fact, given on August 30, 1924; suit was commenced on August 29, 1924. It is not necessary for us to determine what the rights of defendant might be, if it had undertaken to complete the project, and had been refused this oppor-

tunity by plaintiff, for the facts in this case do not warrant this assumption. It is apparent that, neither at the time of default, nor since, has defendant manifested any desire or interest in the project, except in attempt to disclaim all liability with reference thereto.

There are other matters concerning items of expense which are argued by defendant. We have carefully considered them, and find that the contentions with reference to them are similar to the ones we have discussed, and our disposition of those under consideration will govern as to those which we have not specifically mentioned.

Every act of Payne with reference to this project, and especially with reference to aiding the subcontractors in making financial arrangements that they might continue with their contract, was within the scope of his authority as agent for defendant, and his knowledge of irregularities, if any, in conducting the business affairs of the subcontractors, in order to enable them to carry out their agreement with plaintiff and relieve defendant of liability, became the knowledge of defendant. The acts of which defendant now complains were all with the knowledge, consent and approval of the agent, and, in some instances, at his instigation, insistence and command, and therefore defendant cannot now complain. The referee and trial court were justified in finding, under the evidence in this case, that everything Payne did was within the scope of his delegated authority, and that these acts were ratified, if ratification was necessary, by defendant, or that the unperformed conditions of the contract and bond were waived.

■■ The advance of money by plaintiff to the subcontractors was not a payment in advance for services under the contract, and would not relieve defendant even though made without its consent and approval. It must be remembered that the advances in the early stages of this project were minor in amount, and were all repaid long prior to any default of which complaint is made herein, and that the advances were made at the request,

258

solicitation and insistence of the general agent of defendant, and under his express promise to protect the plaintiff in making them. Defendant relies upon *United States Co. v. Citizens Co.*, 62 Colo. 440, 443 et seq., 163 Pac. 281, for support in its contention that these advances were payments which released it from liability. The opinion is not susceptible of any such construction, and a reading and consideration thereof clearly distinguishes that case from the one under consideration here. It may be said that an ''advancement or loan is not a payment which, being made contrary to the contract, will affect the surety's liability, even though it is stipulated that the loan shall be repaid out of the next payment under the contract.'' 50 C. J. 166. Even assuming that the sums paid by plaintiff to the subcontractors were as payments, rather than as advances or loans, this would not relieve the surety. ''So to release a surety it has been held that an overpayment must undoubtedly be of such an amount, relative to the whole contract, or to that part of it left undone, that the court can say as a matter of law, or a jury as a matter of fact, that a material incentive to the completion of the contract has been done away with to the detriment of the surety. * * * A premature payment will not discharge a surety where it is made with his knowledge and acquiescence or by his request.'' 21 R. C. L. 1014.

With respect to the cement item, it may be said, that the general agent of defendant insisted that the arrangement for handling the entire monthly estimate be made by plaintiff and the subcontractors with Mills, so that he might receive and disburse the same in payment of expenses contracted on the project, and even though Payne subsequently, and prior to October, 1924, ceased to represent defendant, a fact which is not proven herein, the arrangement, made at his insistence, continued to exist, and defendant cannot now hide behind its dismissal of Payne, if such was a fact, and thereby release itself from liability on its bond.

■ At the time defendant entered itself as surety for the subcontractors, it had before it the contract between plaintiff and the subcontractors, and well knew its terms and conditions. The premium, which defendant charged the subcontractors, was based upon the amount involved in plaintiff's contract with the state; if the contract between plaintiff and the subcontractors was vague, ambiguous, and not easily understood, before it signed as surety was the proper time for defendant to insist upon clarification. The evidence in the case clearly indicates that everyone connected with this transaction understood and believed that the bond was to guarantee the performance of the contract, with minor exceptions, which plaintiff had with the state, and this understanding still prevailed until defendant first conceived the idea that a liability had been incurred, and then defendant became hypercritical about conditions and provisions in the contract and bond, and contended that everything done in connection with this project was in direct violation of these conditions and provisions, and defendant was thereby released from all liability thereunder. It seems clear that it was the intention of plaintiff and subcontractors, and was so understood by defendant, that the subcontractors were "stepping into the shoes" of plaintiff and that the surety was undertaking to see that the subcontractors carried out every promise that plaintiff had theretofore undertaken to keep in his contract with the state. The referee found, and the trial court approved the finding, that the conditions and provisions of the contract and bond, in so far as either imposed any duty upon plaintiff, were substantially complied with and carried out; defendant was not damaged or injured by any change for which plaintiff was responsible, and nothing done by plaintiff operated to release it.

■ Defendant takes the position "that it is the deviation from the terms of the contract that operates to release the surety, and not the injury or damage done by such deviation." In connection with damage done by

such deviation, in *Curry v. Equitable Surety Co.,* 27 Colo. App. 175, 187, 148 Pac. 914, we said:

"There is another rule of law which seems to be pretty well established at the present day, and that is that sureties for profit, when sued upon bonds or undertakings such as we are now considering, must, in order to establish a defense, be able to show that they have been injured or deprived of some legal right, by or through the action of the sheriff or plaintiff creditor. In *Bross v. McNicholas et al., supra,* it is said:

" 'In this day and age of corporate sureties, when the burden is lightened by the payment of adequate premiums, and their final liabilities ofttimes secured by counter indemnity, the strictness of the old rule is relaxed, and the modern day surety company must show some injury done before they can be absolved from the contracts which they clamor to execute.' "

There is no item which was allowed against defendant, and taken into consideration in fixing the amount of the judgment, which was not actually expended for work, services and materials included in the agreement of the subcontractors. Defendant was a compensated surety, and the general rule is, that, in order for one such to be released from liability, by an alteration or departure from the contract, it must have been prejudiced thereby. *National Surety Co. v. Queen City Co.,* 63 Colo. 105, 111, 164 Pac. 722; *Empire State Surety Co. v. Lindenmeier,* 54 Colo. 497, 505, 131 Pac. 437; 21 R. C. L. 1160; 50 C. J. 316; 50 C. J. 121.

All the items which we have mentioned and discussed, as well as others argued by counsel for defendant, were properly taken into consideration by the referee and the trial court, and were properly considered by both, in computing the amount for which defendant was liable on its bond.

We might add that the contract between plaintiff and the subcontractors, for the faithful performance of which defendant became surety, and this bond upon

which defendant became surety, repeatedly refers to the contract between plaintiff and the state, and it requires no strained construction to say that the contract between plaintiff and the state became an integral part of the contract between plaintiff and the subcontractors, to the same extent, and with the same effect, as if its every provision, except with reference to the cement item, had been accurately and actually incorporated into it, and with the plaintiff's contract incorporated into the contract between plaintiff and the subcontractors, we find the contract which defendant entered itself as surety to provide for the performance of its every condition. So far as this action is concerned, defendant is in the same position with reference to plaintiff as plaintiff's surety was with reference to the state of Colorado. With reference to the construction to be given surety bonds, in *Empire Co. v. Lindenmeier, supra,* we said at page 505:

"The defendant is a surety company engaged in the business of furnishing surety bonds, and must be considered in the light of the rule of construction as to strictness in such cases, differing from that of individual sureties.

" 'Generally speaking, a contract of suretyship by a surety company is governed by the same rules as the contracts of other sureties, but some distinctions are made by the courts in construing such contracts. The doctrine that a surety is a favorite of the law, and that a claim against him is *strictissimi juris,* does not apply where the bond or undertaking is executed upon a consideration, by a corporation organized to make such bonds or undertakings for profit. While such corporations may call themselves 'surety companies,' their business is in all essential particulars that of insurers. Their contracts are usually in the terms prescribed by themselves, and should be construed most strongly in favor of the obligee.' 32 Cyc. 306. An investigation of the authorities cited by the author, will disclose that this text is a fair statement of the modern rule."

■ 4. The bond is in the sum of $20,000, and in it is found this provision: "* * * that no judgment shall be entered against the surety in excess of the penalty hereof." The judgment actually entered against defendant was in the sum of $25,568.66, and, in addition to all other objections thereto, defendant contends that the amount is excessive, and that the entire judgment could not exceed $20,000, including interest. The judgment was made up of $20,000, penalty on the bond, and $5,866.66 interest. In *Empire State Surety Company v. Lindenmeier*, 54 Colo. 497, 503, 131 Pac. 437, Ann. Cas. 1914C, 1189, it is said: "The question of interest in such cases is one concerning which there has been much conflict of authority. It is a general rule, and well settled, that sureties are liable only to the extent of the penalty of the bond. But the later and apparently preponderance of authority in this country is to the effect that interest may be allowed from the time of the default, even though this may make the judgment in excess of the penalty named in the bond, not, however, as a part of the debt for which he originally became responsible, but as damages for its detention." See also: Stearns on the Law of Suretyship, p. 262, §155; 50 C. J. 90; 21 R. C. L. 1087.

We see no reason for drawing any distinction between the bond in question, and that under consideration in the Empire-Lindenmeier case, supra. If we adopt defendant's construction and limit the judgment to $20,000, for which counsel for defendant in this case contend, it would be profitable for surety companies to arbitrarily and habitually withhold payment of just claims, in order to partially reimburse themselves for losses to the extent of the interest on the principal amount for such period as they might delay payment, while surety companies which admit their obligations, and promptly pay their losses, would be penalized for their promptness. This is not the policy of the law.

We have carefully read the entire record in this case,

and have examined the briefs and all the citations therein, and when it is considered that under the agreement between plaintiff and the subcontractors, for the faithful performance of which this defendant became surety, it was expressly stipulated ''that the sub-contractors shall complete the job in full conformity with the agreement between the contractor [White] and the State Highway Department,'' the conclusion is inevitable that defendant became surety in like manner, and to exactly the same extent to plaintiff herein, as plaintiff was, under contract with the state, and the liability of defendant, under the circumstances of this case, is exactly the same as would have been the liability of plaintiff's surety had he defaulted in regard to his contract. By reference, the specifications and contract of plaintiff became an integral part of the contract between plaintiff and the subcontractors and for the performance of which defendant became surety.

Judgment affirmed.

MR. CHIEF JUSTICE WHITFORD, MR. JUSTICE BURKE and MR. JUSTICE MOORE concur.