**BRIGHTON SCHOOL DISTRICT 27J, a political subdivision of the State of Colorado, Plaintiff–Appellee,**

**v.**

**TRANSAMERICA PREMIER INSURANCE COMPANY, n/k/a TIG Premier Insurance Company, Defendant–Appellant.**

**No. 94CA1566.**

Colorado Court of Appeals,
Div. IV.

Feb. 8, 1996.

Rehearing Denied March 14, 1996.

Certiorari Granted Sept. 23, 1996.

Miller, DeLay & Crabb, P.C., Thomas S. Crabb, Pauline A. Brock, Westminster, for Plaintiff–Appellee.

Quiat, Schlueter, Mahoney & Ross, P.C., Laurin D. Quiat, Denver, for Defendant–Appellant.

Opinion by Judge BRIGGS.

Defendant, Transamerica Premier Insurance Company, n/k/a/ TIG Premier Insurance Company (surety), appeals the judgment of the trial court awarding plaintiff, Brighton School District 27J (school district), damages for breach of contract in regard to a surety contract and for breach of the duty of good faith and fair dealing. The issues raised on appeal include whether a surety can be liable to the bond obligee for the tort of bad faith. We affirm.

As part of the remodeling of Brighton High School, the school district contracted with Adco Mechanical Contractors, Inc., (contractor) in July 1991 for a complete retrofit of the building's heating, ventilation, air conditioning, and plumbing. As required by the contract and statute, the contractor provided the district a performance bond, issued by the surety.

Soon after remodeling began, the school district became concerned with the quality and pace of the contractor's work. In December 1991, and again in January 1992, the school district sent memos to the contractor requesting corrective action. It also provided the surety with a status report indicating that the contractor was consistently understaffing the project. In a January meeting, the district's representatives provided the contractor with a detailed list of items that needed correction and completion. An agreement was reached as to new completion dates.

The contractor continued to miss deadlines, and in April the school district discovered numerous additional defects in the work that had been completed. In a memo dated April 17, the district's construction manager informed the contractor of various continuing and new problems and demanded immediate "major progress." Two weeks later, the district discovered further defects in the work that had been completed. The contractor was ordered off the job pending further investigation.

The school district's investigation revealed yet further defective, incomplete, and nonconforming work. In its May 19th letter terminating the construction contract, the school district stated that the contractor had consistently failed to supply enough properly skilled workers and proper materials, was guilty of substantial violations of the construction contract, and had failed to make

necessary corrections for an extended period of weeks and after written notice. On the same day, the school district informed the surety of the termination and of its intent to make a claim on the contractor's bond.

In June representatives of the surety and the school district met to discuss how to proceed. After the meeting, the new job was bid, the contract awarded, and work by the new contractor begun. However, the surety then informed the school district that it had not complied with its obligations under the construction or the surety contracts. The surety refused to make any progress payments.

When the work was completed, the school district again demanded payment for the new contractor's work. The former contractor had filed bankruptcy and the surety continued to refuse to pay anything.

The former contractor brought suit against the school district for the unpaid balance under its construction contract. The school district joined the surety as a third-party defendant. After the contractor declared bankruptcy, its claim against the school district was dismissed and the parties were realigned, with the school district as plaintiff and the contractor and surety as defendants.

The jury found for the school district and awarded the cost of remediation and completion on the claims of breach of the construction and surety contracts. On the district's claim of bad faith against the surety, the jury awarded $10,000, apparently representing part of district's payments to consultants, and attorney fees in an amount to be determined by the court. The court then awarded attorney fees and costs incurred in collecting the amount due under the surety contract, subtracting out the amount of fees incurred in proceeding on the claim of bad faith. This appeal followed.

I.

The surety contends the trial court erred in allowing the school district to proceed to trial on a claim of bad faith breach of the surety contract. We perceive no error.

The General Assembly has enacted provisions prohibiting unfair or deceptive trade practices in the insurance industry. *See* §§ 10–3–1101 to 10–3–1114, C.R.S. (1994 Repl.Vol. 4A) (the Act). The Act establishes industry standards concerning misrepresentation, unfair discrimination, unfair claim settlement practices, and other improper practices, and its provisions expressly apply to contracts of suretyship. *See* §§ 10–3–1102(2) and 10–3–1104, C.R.S. (1994 Repl.Vol. 4A).

The Act provides only for state regulation of the insurance industry and does not create a private cause of action. *See* § 10–3–1114, C.R.S. (1994 Repl.Vol. 4A); *Farmers Group, Inc. v. Williams,* 805 P.2d 419 (Colo. 1991); *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138 (Colo.1984); *Appel v. Sentry Life Insurance Co.,* 701 P.2d 634 (Colo.App.1985), *aff'd,* 739 P.2d 1380 (Colo.1987). Thus, the Act itself cannot be used as a basis for a claim of bad faith breach of an insurance contract. *See Schnacker v. State Farm Mutual Automobile Insurance Co.,* 843 P.2d 102 (Colo.App.1992).

However, § 10–3–1114, C.R.S. (1994 Repl. Vol. 4A ) expressly provides that the statutory provisions do not abrogate any common law contract or tort cause of action. Further, § 10–3–1113(1), C.R.S. (1994 Repl.Vol. 4A) provides that, in any civil action against an insurance company, the trier of fact may be instructed that the insurer owed its insured the duty of good faith and fair dealing. The school district's claim was properly pled as a common law claim in conformance with § 10–3–1113. *See Farmers Group, Inc. v. Williams, supra.*

The surety contends that, even if the claim were in compliance with § 10–3–1113, the statute applies only to claims against an insurance company. It asserts that a commercial surety contract differs in several respects from an insurance contract, including that the principal is primarily liable, with the surety's obligation essentially an extension of standby credit. The surety argues that the imposition of a quasi-fiduciary duty similar to that imposed on insurance companies is not required. We are not persuaded.

Section 10–3–1102(2), C.R.S. (1994 Repl. Vol. 4A) provides: " 'Insurance policy' or 'insurance contract' means any contract of in-

surance ... [or] *suretyship* ... issued, proposed for issuance, or intended for issuance by any person." (emphasis added) This is consistent with the typical treatment of surety contracts as contracts of insurance. *See Federal Surety Co. v. White,* 88 Colo. 238, 261, 295 P. 281, 290 (1930)("While [corporations who receive consideration for issuing bonds] may call themselves 'surety companies,' their business in all essential particulars is that of insurers."); *see also Loyal Order of Moose v. International Fidelity Insurance Co.,* 797 P.2d 622 (Alaska 1990); *see generally* J. Appleman, *Insurance Law & Practice* § 5273 (West 1981); 2 G. Couch, *Cyclopedia of Insurance Law* § 15:8 at 130 (R. Anderson 2d ed. 1984)("Contracts of this kind are now almost universally regarded as those of insurance where the underwriter engages in the business for profit .... ").

In *Farmers Group, Inc. v. Trimble, supra,* the supreme court recognized that an insured's purpose in purchasing liability insurance is to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage. The refusal of the insurer to pay valid claims without justification defeats that expectation. Thus, the court imposed on liability insurance companies a duty of good faith and fair dealing that is breached when an insurer unreasonably refuses to settle a claim.

In *Travelers Insurance Co. v. Savio,* 706 P.2d 1258 (Colo.1985), the supreme court held that a workers' compensation insurance carrier owed a similar duty to an injured worker, even though the worker had not entered into the contract with the carrier. The court reasoned that, although *Trimble* was a third-party liability case, its basic rationale extends to first-party claims by injured workers covered by workers' compensation. However, in a first-party claim the party entitled to benefits has not ceded to the insurer any right to represent the party's interest and can influence the claim evaluation process. The court therefore determined that a party claiming bad faith must establish that the insurer acted unreasonably *and* with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim.

The bond obligee's purpose in requiring a surety contract is to avoid a calamity rather than to gain commercial advantage, the same purpose of an insured as described in *Trimble.* If the only damages a surety has to pay upon a judgment of breach are the amounts that it would have owed under the surety contract plus interest, it is motivated to retain the money, earning perhaps higher rates of interest on the outside market and hoping eventually to force the bond obligee into a settlement for less than the policy amount. Permitting the obligee a tort remedy, as articulated in *Travelers Insurance Co. v. Savio, supra,* provides the same deterrence against breach by a surety that it provides against breach by any other insurer. *See Dodge v. Fidelity & Deposit Co.,* 161 Ariz. 344, 778 P.2d 1240 (1989).

In this regard, we note that performance bonds are required by statute. Issuers of financial responsibility bonds are therefore in a sense affected with a public interest. Permitting sureties to withhold performance of their obligations with impunity would defeat the purpose in requiring surety bonds, to the benefit of the companies profiting from the statutory requirement. *See Dodge v. Fidelity & Deposit Co., supra; Suver v. Personal Service Insurance Co.,* 11 Ohio St.3d 6, 462 N.E.2d 415 (1984).

We recognize that § 10-3-1113 refers to the duty the insurer owes its "insured" and that an injured third party has no claim for bad faith under an insurance liability policy against a tortfeasor's insurer. *See Schnacker v. State Farm Mutual Automobile Insurance Co., supra.* However, a surety contract is required for the benefit of a specific obligee, who negotiates directly with the surety for payment of benefits. The obligee of a surety contract is therefore in substantially the same position as the beneficiary of a first-party insurance contract. *See Loyal Order of Moose v. International Fidelity Insurance Co., supra,* 797 P.2d at 628 ("In our view the relationship of a surety to its obligee—an intended creditor third-party beneficiary—is more analogous to that of an insurer to its insured than to the relationship between an insurer and an incidental third-party beneficiary."). Hence, the same ratio-

nale that led the supreme court in *Travelers Insurance Co. v. Savio, supra,* to conclude that an insurance company is subject to a claim of bad faith by the beneficiary of a first-party insurance contract is applicable to a claim against a surety by its bond obligee. *See* Suver v. *Personal Service Insurance Co., supra,* 462 N.E.2d at 417 ("Precisely the same policy arguments and rationale hold true in both settings.").

Finally, subjecting a surety to a claim of bad faith by a beneficiary of the surety contract does not require the surety to act in bad faith with respect to its principal. As the jury was instructed in this case, a breach of the duty of good faith and fair dealing arises only when the surety knows its position is unreasonable or recklessly disregards the fact that its position is unreasonable. *See Travelers Insurance Co. v. Savio, supra.* By limiting liability in this manner, the surety does not risk violating its duties to either so long as it responds to a claim reasonably. *See Board of Directors v. United Pacific Insurance Co.,* 77 Hawai'i 358, 884 P.2d 1134, 1137 (1994)("This dual responsibility explains the surety's careful examination of the nature of all presented claims before acting upon them."). Furthermore, to the extent the surety may confront difficult decisions, it is in the position of charging a premium that recognizes the difficulties inherent in its business. *See Dodge v. Fidelity & Deposit Company, supra.*

We therefore conclude that, although no contract had been entered into between the school district and the surety, the trial court did not err in allowing the district's common law claim for bad faith breach of the performance bond contract to be submitted to the jury. *See Dodge v. Fidelity & Deposit Co., supra; Board of Directors v. United Pacific Insurance Co., supra; Suver v. Personal Service Insurance Co., supra; but see United States v. Wausau Insurance Cos.,* 755 F.Supp. 906 (E.D.Cal.1991); *Great American Insurance Co. v. North Austin Municipal Utility District No. 1,* 908 S.W.2d 415 (Tex. 1995).

II.

The surety next contends that the school district's claims against it were barred because the school district failed to comply with all preconditions of the construction and surety contracts, in particular the notice provisions of the construction contract. It argues that the jury's verdict for the school district is not supported by the evidence. We conclude to the contrary.

The interpretation of a provision in a contract or surety bond is a question of law for the court. *See Union Rural Electric Ass'n v. Public Utilities Commission,* 661 P.2d 247 (Colo.1983); *General Insurance Co. v. City of Colorado Springs,* 638 P.2d 752 (Colo.1981). However, whether a party has performed its obligations under a contract or bond is a question of fact. *See Bator v. Mines Development, Inc.,* 32 Colo.App. 320, 513 P.2d 220 (1973). We therefore will not disturb a jury's findings on this issue unless they are clearly erroneous. *See Page v. Clark,* 197 Colo. 306, 592 P.2d 792 (1979); *see also Riva Ridge Apartments v. Robert G. Fisher Co.,* 745 P.2d 1034 (Colo.App.1987).

Section 14.2.1. of the contract provides:

> [I]f the contractor persistently refuses or fails ... to supply enough properly skilled workers or proper materials ... or is otherwise guilty of a substantial violation of a provision of the Contract Documents, and fails within seven days after receipt of written notice to commence and continue correction of such default, neglect or violation with diligence and promptness, the Owner ... may ... terminate the employment of the Contractor and take possession of the site and of all materials ... and may finish the Work by whatever methods the Owner may deem expedient.

Contrary to the surety's argument, the construction contract does not require that the notice inform the contractor of the risk of termination or otherwise specify the form of notice. The record includes numerous documents admitted at trial in which the school district expressed to the contractor its dissatisfaction with the contractor's staffing, progress, and performance, and requested action.

In addition to the documents themselves, there was testimony at trial about meetings between representatives of the district and the contractor explaining items referred to in the documents.

In these circumstances, the jury could have properly found from the evidence that the documentation provided by the school district to the contractor gave sufficient notice of the contract violations that eventually led to its termination. Its verdict, which necessarily includes the finding that the school district performed its obligations under the construction contract, is supported by the evidence. We therefore will not disturb it on review. *See Page v. Clark, supra; Hoffman's Double Bar Pine Nursery v. Fyke,* 633 P.2d 516 (Colo.App.1981).

The surety makes the conclusory statement in its brief on appeal that the school district failed "to properly notify" the surety of the alleged breach of the construction contract and to provide it the opportunity to insist upon completion by the contractor or arrange for other contractors to complete the work. However, it refers to no specific provision in the surety contract supposedly violated. Furthermore, the evidence in the record establishes that the surety was provided with status reports, notice of the termination, a demand under the performance bond, and a request for information on how to proceed. Though the surety disputed at trial what transpired at the ensuing meeting between its representatives and those of the school district, the jury could have found from the evidence that the school district complied with every request made by the surety and with all its contractual obligations under the performance bond.

We therefore find no basis for setting aside the jury's verdict on the basis of the school district's noncompliance with its obligations under the construction and surety contracts.

III.

The surety's next contention is that the trial court erred when it refused to instruct the jury on the surety's defense of overpayment and to permit it to introduce evidence of overpayment. We perceive no error.

In some circumstances, courts have held that if the obligee makes payment for work not performed or obviously defective, the surety may be partially or totally released from its payment obligations. However, the success of the overpayment defense, like any other, depends on the contractual agreement. *See generally* J. Knox, *Quid Without Quo: The Surety's Overpayment Defense,* The Construction Lawyer 3 (October 1993).

Here, the performance bond executed by the surety incorporated the terms of the construction contract between the contractor and the district and therefore binds the surety. That contract contains the following provisions:

> 4.3.3. The Contractor shall not be relieved from the Contractor's obligations to perform the Work in accordance with the Contract Documents either by the activities or duties of the Construction Manager or the Architect in their administration of the Contract, or by inspections, tests or approvals required or performed by persons other than the Contractor.
>
> ....
>
> 7.6.2 No action or failure to act by the Owner, the Architect, the Construction Manager or the Contractor shall constitute a waiver of any right or duty afforded any of them under the Contract, nor shall any such action or failure to act constitute an approval [of] or acquiescence in any breach thereunder, except as may be specifically agreed in writing.
>
> ....
>
> 9.4.1. The Architect will, within seven days after the receipt of the Project Application for Payment with the recommendations of the Construction Manager, review the Project Application for Payment and either issue a Project Certificate for Payment to the Owner ... or notify the Construction Manager in writing of the reasons for withholding a Certificate....

. . . .

9.5.1 After the Architect has issued a Project Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents.

. . . .

9.5.5 No certification of a progress payment, any progress payment, or any partial or entire use or occupancy of the Project by the Owner, shall constitute an acceptance of any Work not in accordance with the Contract Documents.

The construction contract thus required the school district to make payments when the architect issued a project certificate for payment and provided that no such payment constituted an acceptance of any work not in accordance with the contract documents or relieved the contractor from its obligations under the contract. Hence, because none of the payments constituted a modification of the construction contract materially increasing the surety's risk, the defense of overpayment is not applicable. *See Argonaut Insurance Co. v. Town of Cloverdale,* 699 F.2d 417, 420 (7th Cir.1983)("The town is not in the construction business and there was no reason for it to think it ought to verify the engineering firm's estimates. But [the surety] is in the business of insuring construction contracts and if it was unhappy with the town's choice of engineers, or with the delegation to the engineering firm of responsibility for calculating the progress payments that were due, it did not have to agree to insure the contract."); *Mergentime v. Washington Metropolitan Area Transit Authority,* 775 F.Supp. 14 (D.D.C.1991).

Moreover, the surety's contention that the trial court improperly refused to permit evidence of overpayment is not supported by the record. To the contrary, the record contains testimony by agents of the school district that, although they thought the contractor was understaffed and behind schedule, they approved payments to it. The surety referred to this evidence in closing argument to support the assertion that the school district had failed to mitigate its damages. And, the trial court instructed the jury that, if it found the school district was entitled to damages, any damages resulting from a failure to mitigate could not be awarded.

Because the contract precluded the surety's defense of overpayment, and because the surety was in any event permitted to introduce evidence and argue for a reduction of damages based on overpayment, we conclude that the trial court did not err in refusing to instruct the jury on the defense.

IV.

The surety asserts that the trial court erred when it refused to allow testimony and to instruct the jury on the surety's "partial or whole affirmative defense" of the negligence of the school district or its agents in approving the pay applications of the contractor. We again find no reversible error.

We can consider on appeal only those objections regarding instructions that appear in the record. *See* C.R.C.P. 51. And, it is not the duty of the reviewing court to search the record for evidence to support bald assertions. *See Mauldin v. Lowery,* 127 Colo. 234, 255 P.2d 976 (1953); *In re Marriage of Miller,* 888 P.2d 317 (Colo.App.1994).

The surety has directed us to nothing in the record that indicates it offered any instruction on the defense of negligent approval of pay applications. Furthermore, as already noted, the construction contract expressly precludes a defense based on the alleged negligence of the school district or its representatives in the decision to pay the contractor. We therefore find this argument to be without merit.

V.

The surety contends the trial court erred in granting the school district's motion to strike from the witness list an attorney in the law firm representing the district. We perceive no reversible error.

The surety deposed the attorney because he had attended a meeting of the surety's representative and the school district's representatives and agents during which the surety's representative purportedly gave the

school district permission to call for bids to remedy and complete the work started by the contractor. At least seven witnesses who attended this meeting testified they recalled that during this meeting the surety's representative approved of the school district's plans to proceed.

In his deposition, the attorney testified that he could not recall what was said at the meeting and that his memory came mostly from conversations with other attorneys in his law firm. The surety sought to call this attorney to testify at trial. The school district filed a motion to strike the attorney as a witness, and the trial court granted the motion.

The surety does not refer us to a part of the record which indicates the basis for the trial court's ruling. However, the testimony of this witness would not have countered the testimony of the other seven witnesses as to events at the meeting. Rather, it would have established only that one participant could not independently recall all the events of the meeting. Because the exclusion of the evidence did not affect the substantial rights of the surety, we conclude that no reversible error occurred. *See* CRE 103(a); C.R.C.P. 61.

VI.

The surety contends the trial court erred in awarding attorney fees to the school district because fees are not recoverable for prosecution of a claim of bad faith and the school district failed to present sufficient evidence to distinguish fees incurred on its breach of contract claim from those incurred on its bad faith claim. Based on the record before us, we find no reversible error.

A party seeking attorney fees bears the burden of proving by a preponderance of the evidence its entitlement to the amount sought. *See Kinsey v. Preeson,* 746 P.2d 542 (Colo.1987). When necessary, sufficient evidence must be produced for the court to be able to exercise its discretion in determining the amount of fees allocable to each claim. *See Fountain v. Mojo,* 687 P.2d 496 (Colo.App.1984).

However, the burden is on the appellant to provide a record justifying reversal. Absent such a record, we presume the regularity of the trial court proceedings. *See Alessi v. Hogue,* 689 P.2d 649 (Colo.App. 1984).

Here, the record includes the school district's motion for attorney fees and attached documentation and notice of a hearing. Pleadings filed by both parties in the trial court indicate that a hearing took place and that, after closing arguments, the court requested the parties to submit supplemental briefs on the impact of the decision announced eight days earlier in *Bernhard v. Farmers Insurance Exchange,* 885 P.2d 265 (Colo.App.1994)(fees incurred to collect amounts due under insurance contract are recoverable under bad faith claim against insurer but those incurred in prosecution of the bad faith claim itself are not).

The record further includes the school district's supplemental brief and attached billing documentation. Each time entry is allocated by the district between the claims for breach of performance bond and bad faith.

In its responsive supplemental brief, the surety conceded that under *Bernhard* the jury's verdicts on the school district's bad faith claim entitled it to fees incurred to obtain the benefits payable under the surety bond. The surety likewise did not object to the district's submission of the additional documentation. It nevertheless argued that insufficient evidence had been presented at the hearing to permit allocation of fees between the two claims and that, even if the evidence permitted allocation, $17,175 should be allocated to the bad faith claim, rather than the $14,528 allocated by the school district.

What the record does not contain is a transcript of the hearing on the request for attorney fees and costs. The only record of the hearing is the court's order in which it awarded attorney fees and costs but deducted $17,715 allocated to the bad faith claim.

The trial court's award of attorney fees and costs was consistent with the decision in *Bernhard v. Farmers Insurance Exchange, supra,* which the surety does not challenge

on appeal. Because the record on appeal does not permit us to review the evidence presented at the hearing on the amount of fees and costs to be awarded, and because we perceive no error in the record before us, we find no reversible error in the trial court's award of attorney fees and costs. *See Alessi v. Hogue, supra.*

VII.

The surety finally contends the trial court erred in denying its motion for mistrial because jurors were prejudiced against it by the comments of an attorney made in the courtroom hallway. We are not persuaded.

An expert witness for the surety had a hallway conversation with an acquaintance who was also an associate of the law firm representing the district. In jest, the associate told the expert to tell the truth when testifying. The expert reported to the trial court that a juror might have overheard this comment.

The court decided the procedure to be followed was to inquire of the jurors whether any of them had overheard a conversation involving the expert witness and, if any had, to conduct further voir dire in chambers. The court asked if there were any objections to this procedure, and counsel made none. The trial court so inquired. No juror indicated overhearing any such conversation.

A party asserting that a judgment must be reversed because jurors overheard prejudicial remarks has the burden to show both that the jurors did overhear the remarks and that a reasonable possibility exists the jurors were prejudiced. *See Wilson v. O'Reilly,* 867 P.2d 92 (Colo.App.1993). Mere speculation as to the possibility the jurors were prejudiced is not sufficient. *See People v. Peltz,* 697 P.2d 766 (Colo.App.1984), *aff'd,* 728 P.2d 1271 (Colo.1986).

The trial court's denial of the surety's motion for mistrial will not be disturbed on appeal absent an abuse of discretion. *See People v. Ferrell,* 200 Colo. 128, 613 P.2d 324 (1980); *Wilson v. O'Reilly, supra.* We perceive no abuse of discretion here.

Judgment affirmed.

MARQUEZ and KAPELKE, JJ., concur.