**UNION RURAL ELECTRIC ASSOCIATION, INC., Petitioner-Appellee,**

v.

**The PUBLIC UTILITIES COMMISSION OF the STATE of Colorado and Public Service Company of Colorado, Respondents-Appellants.**

No. 81SA286.

Supreme Court of Colorado,
En Banc.

March 21, 1983.

Rehearing Denied April 25, 1983.

Walker Miller, Alfred T. McDonnell, Greeley, for petitioner-appellee.

Kelly, Stansfield & O'Donnell, Donald D. Cawelti, Denver, for respondent-appellant Public Service Co. of Colorado.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Eugene C. Cavaliere, Asst. Atty. Gen., Denver, for Public Utilities Com'n of State.

LOHR, Justice.

The Public Service Company of Colorado (Public Service) filed a complaint with the Public Utilities Commission (Commission) against the Union Rural Electric Association, Inc. (Union), alleging that Union's provision of electric service to a newly-constructed concrete batch plant violated Commission Decision No. 63322, which approved and incorporated a 1964 agreement between the parties. The Commission found that Union was in violation of Decision No. 63322 and ordered Union not to serve the new customer. (Decision No. 2433.) The Adams County District Court set aside the Commission's Decision No. 2433, holding that the Commission had exceeded its authority and abused its discretion by interpreting the approved agreement in a manner contrary to the parties' intent and the public interest. We reverse the district court judgment and reinstate the Commission's decision.

The agreement at issue was the result of several years of conflict and competition between the parties concerning their rights to serve customers within certain areas. In 1938, Union was incorporated in Colorado for the purpose of providing electric service to its members, located in several rural counties north of Denver. Public Service, a certificated public utility, responded to urban and suburban growth by expanding its facilities into areas previously exclusively served by Union, resulting in overlapping of service areas and duplication of lines. Union had no legal standing to object to the presence of Public Service in its territory because Union was not considered to be a public utility.[1] In 1955, Union sought and received Commission certification as a pub-

---

1. Under Union's articles of incorporation and bylaws, it could not provide electric service to consumers who were not members of that rural electric association. As a matter of law, this precluded Union from being certificated as a public utility. In order to achieve status as a public utility, Union amended its articles of incorporation and bylaws to permit it to provide electric service to nonmembers. *See generally Public Service Co. v. Public Utilities Commission,* 142 Colo. 135, 350 P.2d 543 (1960), *cert. denied,* 364 U.S. 820, 81 S.Ct. 53, 5 L.Ed.2d 50 (1960).

lic utility, but the Commission denied Union's request to have certain territories certificated for its exclusive use. This court upheld the Commission's certification of Union as a public utility, authorized to provide service to its existing members and customers except for those located in areas certificated to other public utilities. We also held that Union's new status did not impair the rights of Public Service under its certificate and statutory authority to continue its expansion into areas contiguous to its facilities and that Union was required to apply to the Commission for approval of any of its proposed expansions. *Public Service Co. v. Public Utilities Commission,* 142 Colo. 135, 350 P.2d 543 (1960), *cert. denied,* 364 U.S. 820, 81 S.Ct. 53, 5 L.Ed.2d 50 (1960).

Competition between Union and Public Service for the right to serve customers continued, and the two utilities entered into negotiations to resolve problems of duplication of facilities in several areas. The parties signed an agreement on April 20, 1964, which was later approved by the Commission as consistent with the public interest in Decision No. 63322. In the agreement, the parties designated six service areas, labeled them A, B, C, D, E and E–1, and divided the areas between themselves, subject to Commission approval. Areas A, B and C were designated "Union Areas," and Areas D, E and E–1 were designated "Public Service Areas," although Union retained the right to serve certain customers in Areas E and E–1. In article II, paragraph 5 of the agreement, the parties provided for the following method of allocating customers in Area E:

Within Area E Public Service shall continue to serve all of its existing customers and shall serve all future electric loads of whatsoever nature occurring within said Area E, subject to the following:

a. Union may continue to serve its customers who were connected to its lines on March 29, 1963 and any successors of such existing customers who will receive service at the same dwelling, building, or point of delivery, but Union shall not serve any additional customers whatever or any additional electric loads of existing customers where service is provided at any other or additional dwelling, building, or point of delivery (except barns, sheds or other agricultural outbuildings) or which requires construction or extension of electric facilities by Union or by its customer.

b. Notwithstanding the above, however, Union shall be entitled to supply electric energy for increased consumption at the same dwelling or building or point of delivery of its existing customers occasioned by normal increases in use of electric energy for the same purpose utilized as of the date hereof and shall be entitled to convert or rebuild existing lines or add additional transformer capacity thereto, etc., for the purpose of supplying such increased consumption of its existing customers.

The present dispute involves the application of these provisions to a new customer within Area E. At the time of the 1964 agreement, Union was providing what it called "large power" electric service to a commercial customer, Averch Feed Lot, located in Area E.[2] The transformer bank installed on the property to distribute electricity to the feedlot had a load-carrying capacity of 112.5 kva (kilovolt-amperes). Averch subsequently discontinued operations and sold the property to C&M Companies (C&M), which built a concrete batch plant on the property in a different location than that of the feedlot. On December 17, 1979, Public Service received an application from C&M for electric service to the proposed batch plant. When Public Service contacted Union to indicate its intention to serve the new customer, Union disputed the right of Public Service to serve C&M and requested that the parties meet to negotiate

---

**2.** Electric service to Averch Feed Lot consisted of service to a feed mill, a house, a quonset hut, wells, and yard lights.

the dispute.[3] Attorneys for the parties discussed the possibility of negotiations, but the attorney for Public Service finally did not agree that Union's proposal to "trade territory" was a proper basis for negotiation.

On March 13, 1980, Union began extending its existing facilities in order to service the C&M plant, and on March 18, 1980, Public Service filed its complaint with the Commission. A prehearing motion by Union to dismiss the complaint on the ground that Public Service was required to negotiate the matter pursuant to a provision in the 1964 agreement was denied by the Commission on April 15, 1980. By the time of the hearing, on July 7, 1980, Union had made several changes in its facilities on the C&M property. Portions of an aerial three-phase power line were removed and replaced with an underground three-phase line in a different location.[4] The 112.5 kva transformer through which electricity was delivered to the feedlot from Union's three-phase power line was removed and replaced with a larger transformer with a load-carrying capacity of 300 kva to match the design load for the new batch plant. The new transformer is located at the site of the batch plant, away from the old feed mill site, and connected to the remaining portion of the aerial power line by a new underground three-phase line extension of 425 feet. Service to the batch plant is still classified by Union as "large power" commercial service.

The hearing examiner, after taking evidence concerning the changed service and the negotiating history of the parties, transmitted a recommended decision to the Commission holding that the Commission did not have jurisdiction to order specific performance of a contract and that, even if it did, the complaint would have to be dismissed because the relevant contract provisions violated the public policy against establishment of "non-exclusive" areas served by two or more utilities, citing *Western Colorado Power Co. v. Public Utilities Commission,* 163 Colo. 61, 428 P.2d 922 (1967). The Commission did not adopt the examiner's recommended decision but entered its own decision, finding Union to be in violation of the approved agreement in the following four particulars:

 a. It has extended its electric facilities,

 b. To a new point of delivery,

 c. To serve a new customer,

 d. Located at an additional building.

Neither the recommended decision of the examiner nor the final decision of the Commission addressed Union's argument that Public Service was required to negotiate prior to filing the complaint, an issue previously resolved in the order denying Union's motion to dismiss.

On appeal, the district court held that the Commission had abused its discretion in adopting an interpretation of the agreement contrary to the public interest and the intent of the parties during negotiations. The court held that the parties intended that Union would keep its present customers and all future customers on the same properties if no major changes in service occur. The court stated that the changes required to serve the C&M plant, including the increased transformer capacity, the 425 foot line extension and the change in transformer location, were not so substantial as to affect Union's right to furnish electricity to the customer. Further, the court stated that interpreting the agreement to give Public Service the right to provide the ser-

**3.** All together Union sent three letters to Public Service requesting negotiation. The first letter, sent November 27, 1979, is not in the record, but it apparently requested discussions to resolve "all present and potential service problems in Area E." The second letter was sent on January 2, 1980, in response to notification by Public Service of its intent to serve the C&M plant. The third letter was sent on March 21, 1980, apparently before Union had received the March 18 complaint filed by Public Service with the Commission.

**4.** The record does not precisely establish the lengths of the old and new power lines, but exhibits entered into evidence at the hearing show that each line is several thousand feet long. The new line does not serve C&M but passes through the C&M property to provide electric service to other customers to the north.

vice would be against the public interest because duplication in facilities would occur. Finally, the court held that Public Service had failed to negotiate in good faith prior to filing a complaint, as required by the agreement. Both Public Service and the Commission appeal to this court from the judgment of the district court pursuant to section 40–6–115(5), C.R.S.1973. We agree with the Commission's construction of the agreement and so reverse the judgment of the district court.

## I.

In reviewing a Commission decision, the district court is required to decide all relevant questions of law but may engage in only a limited review of fact findings to determine whether the decision is just and reasonable and in accordance with the evidence. Section 40–6–115(3), C.R.S. 1973. In the usual case, the Commission's interpretation of its own language in a previous decision is accorded great weight and will not be disturbed on review unless clearly erroneous. *Public Utilities Commission v. Grand Valley Rural Power Lines, Inc.,* 167 Colo. 257, 447 P.2d 27 (1968); *McKenna v. Nigro,* 150 Colo. 335, 372 P.2d 744 (1962). However, Decision No. 63322, interpreted by the Commission in the present case, incorporated the parties' 1964 agreement without modification. Under these circumstances we believe that familiar principles of contract construction provide the appropriate guidance in determining the meaning of the agreement language as so incorporated, and that the Commission's interpretation, though entitled to respectful consideration, is not controlling.

Interpretation of contract language is generally a question of law. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.,* 195 Colo. 253, 577 P.2d 748

(1978). While the district court set aside the Commission decision on the ground that it "abused its discretion and exceeded its jurisdiction," apparently the court relied on its authority to determine a legal question when it substituted its own interpretation of the language of the agreement for that of the Commission based on what it discerned to be the intent of the parties and the public interest. We conclude from an independent review of the agreement that the district court attributed an intent to the parties not supported by the contract language and that public policy does not inhibit realization of the parties' true intent.

To aid in construing the language of the agreement, we rely on familiar principles of contract law. The intent of the parties is to be determined from the contract language itself. *Id.* Extrinsic evidence of intent is relevant only if, after examination of the entire agreement, the terms are ambiguous.[5] *Id.* However, a mere disagreement between the parties as to the interpretation of an agreement does not in itself create an ambiguity as a matter of law. *Id.*

We do not believe that Union's contention that the relevant parts of the agreement are ambiguous is supported by a review of the agreement as a whole. To support Union's position, several terms in article II, paragraphs 5a and b must be taken out of context and given a broad meaning. Union may serve the C&M plant only if all of the following are true: C & M is a "successor" to Averch Feed Lot and not an "additional customer;" C&M is receiving electric service at the same "point of delivery;" no "extension of electric facilities" is required; and the increased consumption of electric energy is "occasioned by normal

---

5. Whether a contract is ambiguous is a question of law for the court. *Gran Prix Imports, Inc. v. Buckley Bros. Motors, Inc.,* 633 P.2d 1085 (Colo.App.1979), *rev'd on other grounds,* 633 P.2d 1081 (Colo.1981). Once a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues. *Id.* Therefore, if the present contract were ambiguous, any factual findings of the Commission on the intent of the parties should be given deference on appeal under the review standard for factual findings. In this case, it appears that the Commission decision was based on a construction of the language within the four corners of the agreement, not on a determination of ambiguity and reliance on extrinsic evidence.

increases," and is used for the same "purpose." Under Union's interpretation, where one of its customers sells its property, Union could provide service to the new owner at a facility located anywhere on that property, regardless of needed line extensions and changes in meter locations. Union's interpretation would also' permit that utility to accommodate an increased electric load if the past and successor customers are both commercial users, even though the natures of their businesses are entirely different. This broad interpretation of specific terms in article II, paragraph 5 is not supported when that language is read in context with other provisions of the agreement.

The provisions in paragraphs 5a and b of article II were intended only as temporary conditions imposed on a general scheme allowing for Public Service's eventual, gradual takeover of service to all customers located in Area E. In article I of the agreement, setting forth the service areas, the parties provided that "Union shall render exclusive electric service in the areas delineated as Areas A, B and C" and that these three areas are to be referred to as "Union Areas." The parties further provided in article I that "Public Service shall render exclusive electric service in Area E and in the areas delineated as Areas D and E–1" and that such areas are to be called "Public Service Areas." The agreement then provides, however, that Public Service shall not "render service to customers which Union has the right to serve in Areas E and E–1 in accordance with paragraphs 4b and 5a of Article II." Finally, paragraphs 5a and b of article II are preceded by the general introduction that "Public Service shall continue to serve all of its existing customers and shall serve all future electric loads of whatsoever nature occurring within said Area E," subject to the provisions of paragraphs 5a and b.

We must adopt a construction of the agreement that will give effect to all of its provisions. *Oliner v. Englewood,* 42 Colo. App. 106, 593 P.2d 977 (1979); *see Kugel v. Young,* 132 Colo. 529, 291 P.2d 695 (1955). Adoption of Union's interpretation would

reserve to it the right to continue serving virtually all successors to property interests of existing customers, thus creating exclusive service areas for Union within Area E. This interpretation is at odds with the designation of Areas A, B and C only as "Union Areas," and Areas D, E and E–1 as "Public Service Areas," and also renders almost meaningless the right of Public Service to serve all "future electric loads of whatsoever nature" with regard to those enclaves within Area E Union would regard as its exclusive territory. Therefore, the only interpretation giving effect to the intent of the parties is that adopted by the Commission; Union has lost the right to serve the C&M plant because service is provided at a different building and a new meter location requiring an extension of Union's facilities, and C&M requires a greater electric energy supply than Averch Feed Lot for a different purpose.

■ We recognize, as the district court did, that construction of an agreement concerning public utilities must be consistent with the public interest. *See Public Service Co. v. Denver,* 153 Colo. 396, 387 P.2d 33 (1963). We disagree with the district court's conclusion that the interpretation of the agreement adopted by the Commission is contrary to the public interest. Duplication and intermingling of facilities of two or more utilities within an area are not in the public interest if competition, increased overall cost, or inefficiency in service result. However, intermingling is already present in Area E, and the desirable objective is to work toward a gradual reduction of duplication. We have previously upheld as consistent with the public interest a plan whereby a territory is designated exclusively to one utility while another utility is allowed to keep its existing customers and any successors only as long as the nature of the service does not change. *Public Utilities Commission v. Home Light & Power Co.,* 163 Colo. 72, 428 P.2d 928 (1967). Under such a plan, duplication is eliminated in the long run as uses gradually change and one utility assumes the exclusive duty to serve customers within the area.

In addition, any short-run duplication of facilities along the way toward accomplishing the ultimate objective is unlikely to be as substantial as the district court apparently believed. Evidence in the record indicates that the parties will follow their practice with regard to the other areas under the 1964 agreement whereby one utility purchases the power lines and other equipment already installed by the other. As to lines that both utilities must still use in order to serve customers at different locations along such lines, the parties have negotiated joint-use arrangements instead of constructing duplicate lines. We conclude that the Commission properly construed the provisions of the 1964 agreement, as incorporated in its own decision, regarding Union's right to serve certain customers within Area E in accordance with the expressed intent of the parties and the public interest.

## II.

■ The district court also held that Public Service had violated the agreement by refusing to negotiate prior to filing its complaint with the Commission. The court relied on the following provision of the agreement:

This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the transfer and exchange of facilities herein described and service by the respective parties to the affected areas. It is understood and agreed, however, that the parties hereto in their operations as public utilities are charged with the duty and responsibility of rendering electric service to the public in their respective service areas and that while the parties have earnestly and sincerely endeavored to resolve by this Agreement all of their respective operating problems, it is recognized that future problems may arise affecting the opera-

tions of the parties which have not and could not have been anticipated at this time because of the very nature of the public utility business and the ever changing requirements and needs of the public involved. In recognition thereof, the parties hereto covenant and agree that in the event future conflicts arise with respect to their respective electric systems' operations they will meet and negotiate in a bona fide manner toward the end of mutually resolving and agreeing upon a solution to any such conflicts toward the end of adopting a course of operations which will best serve the public interest.

As a remedy for the breach of this covenant, the district court ordered the parties to negotiate, with continuing jurisdiction in the Commission to resolve the dispute in accordance with the district court's interpretation of the agreement if bona fide negotiations break down.

We do not agree with the district court that this section was intended to require negotiation over issues, such as the present one, that are already covered by the terms of the agreement.[6] The language of this provision expressly acknowledges that the parties have attempted to cover all potential problems in the designated service areas but that future problems may arise that "could not have been anticipated." The parties agreed to negotiate in good faith over such unanticipated problems. The allocation of customers in Area E, however, does not fall within the category of unanticipated problems, but is a subject expressly covered by the terms of the agreement. As such, there remains nothing to negotiate with regard to Union's right to serve certain customers in Area E, and the express intent of the parties as set forth in the agreement must be upheld.[7] Accordingly,

6. We reject the argument advanced by the Commission that the negotiation issue was not properly preserved for review in Union's application for reconsideration of the Commission decision as required by section 40–6–114(1) and (5), C.R.S.1973. The application specifically refers to the Public Service's failure to nego-

tiate as a reason why the Commission's decision is unjust and unreasonable.

7. We note that even if the negotiation provision could be read to cover the present dispute, Union would still be required to show that this covenant to negotiate was also a condition precedent to filing a complaint before the Com-

we reverse the district court's judgment and reinstate the Commission's order prohibiting Union from providing electric service to the C&M plant.[8]

mission. The Commission's own decision to the contrary, reflected in its denial of Union's motion to dismiss, supports an interpretation of the agreement that negotiation is not a condition to filing a complaint, for the Commission was construing its own prior decision, incorporating that agreement, in so ruling.

8. That part of the Commission's decision ordering Union to remove its facilities serving the C&M plant is also reinstated. We note, however, that nothing in the Commission's decision precludes the application of the parties' covenant to negotiate in good faith for a smooth transition in service, including the possible purchase by Public Service of Union's facilities. Since the agreement does not cover transition matters in Area E when Union loses a customer, this is a proper subject for negotiation.