GERALNES B.V., a Netherlands corporation; Manikin Investments B.V., a Netherlands corporation; and Dolbos B.V., a Netherlands corporation, Plaintiffs,

v.

CITY OF GREENWOOD VILLAGE, COLORADO, a municipal corporation; The City Council of the City of Greenwood Village, Colorado; Frederick C. Fisher, individually and as Mayor of the City of Greenwood Village, Colorado; Peter Durante, Charles Harmon, Paul McMath, Natli Malloy, Baiba Sarkans, Jerold Slocum, James Talman and Dorothy Wilson, as Members of the City Council of the City of Greenwood Village, Colorado; Paul McMath, individually; Diane Writer, as Chairman of the Planning and Zoning Commission of the City of Greenwood Village, Colorado; Steven L. Schroder, individually and as Director of the Department of Community Development of the City of Greenwood Village, Colorado; Tech Center Building Co., a Colorado partnership; Columbia Savings and Loan Association, a Colorado corporation; United Air Lines, Inc., a Delaware corporation; Rosenberg Real Estate Equity Fund-I, Inc., a Delaware corporation; The Great-West Life Assurance Company, a Canadian corporation; I.T.C. Orchard Plaza Corporation, a Colorado corporation; Block Five Partnership, a Colorado partnership; John R. Elkins; Bruce Johnson; Denver Colorado Associates, a New York general partnership; Country Land Corporation, a New York Corporation; The Aremel Company, a New York general partnership; and The Romarlin Co., a New York general partnership; Defendants.

Civ. A. No. 83–K–1132.

United States District Court,
D. Colorado.

Feb. 13, 1986.

David G. Palmer, William W. Maywhort, Holland & Hart, Denver, Colo., for plaintiffs.

Harris D. Sherman, James E. Scarboro, Arnold & Porter, Denver, Colo., and J. Mark Hannen, Banta, Hoyt, Banta, Greene, Hannen & Everall, Englewood, Colo., for the City of Greenwood Village defendants.

James J. Morrato, Morrato, Bieging, Burrus & Colantuno, P.C., Englewood, Colo., for Tech Center Building Co.

Alan M. Loeb, Davis, Graham & Stubbs, Denver, Colo., for Rosenberg Real Estate Equity Fund-I, Inc., John R. Elkins and Bruce Johnson.

Richard O. Campbell, Montgomery, Little, Young, Campbell & McGrew, P.C., Denver, Colo., for United Airlines, Inc.

Vicki Fowler, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for the Great-West Life Assur. Co.

H. Thomas Coghill, Coghill & Goodspeed, Denver, Colo., for Block Five Partnership.

Stanley A. Doten, Morrison & Foerster, Denver, Colo., for I.T.C. Orchard Plaza Corp.

Patrick F. Kenney, Christina N. Beaton, Fairfield & Woods, Denver, Colo., for Columbia Sav. & Loan Assoc., Romarlin Co., Aremel Co., Denver Colorado Associates and Country Land Corp.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

The plaintiffs in this action are three Dutch Corporations which are successors in interest to DTC–South, a property located in the Denver Technological Center and once owned by Denver Technological Center, Inc., a Colorado corporation.[1] Plaintiffs allege that defendant City of Greenwood Village has engaged in a course of conduct since September of 1981 which has had the result of frustrating the development of DTC–South as afforded plaintiffs under the parties' 1975 Memorandum Agreement and Ordinance No. 6, Series of 1976. All told, plaintiffs have asserted 15 claims for relief.[2] This matter is now be-

---

1. City defendants dispute plaintiffs' assertion that they have succeeded to the rights of D.T.C., Inc. For the purposes of the present motions, however, city defendants admit plaintiffs' successor status. City defendants have not waived their right to resist the purported successorship of plaintiffs at trial.

2. Plaintiffs seek declaratory relief to the general effect that the restrictions contained in Ordinance No. 6, Series of 1976 constitute the full

fore me on plaintiffs' and city defendants' cross motions for summary judgment.

## BACKGROUND[3]

On September 22, 1975, in *Johnston v. City Council of the City of Greenwood Village*, 189 Colo. 345, 540 P.2d 1081, 1082 (1975), the Colorado Supreme Court invalidated the city's annexation of DTC–South under Ordinance No. 3, Series of 1967. DTC–South, then, became a property without a government. As a result, numerous citizens and landowners affected by the *Johnston* decision promptly petitioned the city for re-annexation. DTC, however, declined to join in these petitions.

The DTC–South property consists of more than 200 acres and was valued in excess of $200,000.00. As such, its consent was a legal pre-requisite to re-annexation by the city. *See Pomponio v. City of Westminster*, 178 Colo. 80, 496 P.2d 999 (1972); *Adams v. City of Colorado Springs*, 178 Colo. 241, 496 P.2d 1005 (1972); Colo.Rev.Stat. § 31–12–105 (1973). Desiring DTC's tax revenue and a contiguous land mass within its city limits, the city sought DTC's consent to its proposed re-annexation. DTC refused to consent, but did enter into a pre-annexation memorandum agreement on December 1, 1975. The enforceability of this agreement, the construction of which is sought to be resolved by the instant motions, was upheld by my earlier decision in this case, *Geralnes B.V. v. City of Greenwood Village, Colorado*, 583 F.Supp. 830 (D.Colo.1984).

Under the contract, DTC agreed to forbear any action challenging the validity of the contemplated re-annexation of the Tech Center until the outcome of the requisite re-annexation election. The city agreed to the following: a) to share with DTC certain cost obligations associated with road improvements on and adjacent to DTC–South; b) to validate the then existing streamlined subdivision procedure for DTC–South, which permitted the property to be divided into "superblocks"[4] without specifying each and every lot contained therein; c) to consent to the inclusion of DTC–South within the service area of the Castlewood Water District; d) to seek and obtain the approval of DTC before including DTC–South within any special assessment district before a specified date; e) to incorporate the Master Development Plan for DTC–South, attached to the contract as Exhibit A[5], into the city's overall Master

---

extent of the city's control of the plaintiffs' development of the DTC–South. Plaintiffs also allege that the city is liable for inverse condemnation, breach of contract, damage to private property, impairing the obligation of contracts, promulgating law retrospective in operation, deprivation of constitutional rights, violation of anti-trust laws, civil conspiracy, intentional interference with contractual relations, intentional interference with prospective business advantage, disparagement of property and punitive damages. Claims for relief are also premised on detrimental reliance and equitable estoppel.

**3.** For a slightly more elaborate recitation of the facts in this case see my earlier opinion in *Geralnes B.V. v. City of Greenwood Village, Colo.*, 583 F.Supp. 830 (D.Colo.1984). The facts set forth in this decision are limited to those directly bearing upon the consideration of the instant motions.

**4.** The "superblock" concept was originally contained in Ordinance No. 2, Series of 1975 which created a zoning classification known as "Town Center District". The Town Center District zoning classification was designed to facilitate the

development of a mixed quasi-urban environment containing residences, offices, support services, support, medical and research facilities and recreational facilities. The Town Center Zone was to de-emphasize motor vehicular transportation with an eye toward open space and aesthetics. *See,* Ordinance No. 2, Series of 1975, *Statement of Intent.* A superblock is a zoning classification within a Town Center District. A superblock allows for large tracts of land to be platted and developed without the rigidity inherent in lot by lot delineation associated with conventional zoning schemes and classifications. Superblock delineation facilitates the large scale and creative development envisaged by Town Center District zoning.

**5.** Despite the contract's explicit inclusion of the MDP as one of its terms, plaintiffs deny that the November 1975 MDP was attached to or intended to be a part of the contract. For the limited purpose of the present motions, however, plaintiffs concede that the MDP was intended to be incorporated into the contract. The MDP is a blue print diagram of DTC–South drawn by James M. Bowers and Associates for D.T.C., Inc. It designates 6 superblocks and various planned

Plan; and, f) to repeal in its entirety Ordinance No 2, Series of 1975, (the "old" Town Center District Zoning ordinance), and to enact in its place a less restrictive "new" Town Center District zoning ordinance, attached to the contract as Exhibit B, which would promptly and continuously attach without modification to DTC–South. The contract's attached Exhibit B provided that the new Town Center District zoning ordinance would reflect the following changes from the provisions of the old Town Center District zoning ordinance: a) the deletion of all restrictions on building heights; b) the deletion of requirements pertaining to the number of residential dwelling units; c) the deletion of certain landscaping requirements; d) the deletion of all requirements pertaining to semi-annual review and approval by the city of the Master Development Plan and "general plans" of DTC concerning DTC–South; e) the deletion of the requirement that the city must approve any land use not specified in the MDP; and f) the deletion of all provisions concerning the involvement of the city's Planning and Zoning Commission in planning and development matters affecting DTC–South.

The city also agreed that the new Town Center District zoning ordinance would retain the concept of the land use "bank account".[6] Thus, each site within DTC–South but not then under the ownership or control of DTC, would receive a pro-rata share of the overall available density, determined according to the ratio of the site area to the total area of the district. DTC retained the right freely to transfer and allocate densities among the sites it owned, as long as the overall densities did not exceed the limits set forth in the contract. Exhibit B of the contract, which was to

become the new Town Center District zoning ordinance, Ordinance No. 6, Series of 1976, retained the same formula for calculating the "bank account" as specified in the old Town Center District zoning ordinance. The old as well as the new Town Center District zoning ordinances provide that: a) building ground coverage shall not exceed 40% of the gross acreage within the district; b) parking surface and the surface area of structured parking shall not exceed 40% of the gross acreage within the district; c) a minimum of 30% of the gross acreage within the district shall be reserved for and used as "open space"; and, d) the gross floor area shall not exceed three times the maximum building ground coverage. Thus, as applied to the DTC–South property, the new Town Center District zoning ordinance established a maximum building ground coverage of 7,418,771 square feet, a maximum surface area parking coverage of 7,418,771 square feet, a minimum amount of open space of 5,564,078 square feet, and a maximum gross floor area for the entire zone of 22,256,313 square feet.

On December 9, 1975 the citizens of Greenwood Village voted by a margin of more than 15 to 1 to reannex the Tech Center. The city officially approved the annexation by passing Ordinance No. 18, Series of 1975. As a result, DTC commenced litigation against the city in Arapahoe County District Court (Civil Action No. 35435) asking the court to declare Ordinance No. 18, Series of 1975 null and void insofar as that ordinance sought to annex DTC–South or in the alternative that the entire annexation was null and void.

or existing roads, buildings, parking lots, etc. In one corner of the plan lies a table entitled "Proposed Uses". This chart breaks down superblock proposed uses into office, service, retail or residential. Correlative to each proposed use is a column entitled Maximum Bldg. Area (Sq. Ft.), the total of which is equal to 11.2 million square feet.

6. The "bank account" for a designated Town Center District is established by calculating the maximum amounts of building and parking

ground coverage and gross floor area of buildings, including the minimum amount of open space allowable according to the gross land acreage within the district. As development occurs within the district, the resulting building and parking ground coverage as well as the gross floor area of the buildings is withdrawn from the remaining allowable coverages contained in the "bank account". As areas within the district are dedicated for use as open space, these areas are deposited in the "bank account" as credits toward the required minimum.

On March 2, 1976, pursuant to the contract, the city passed Exhibit B of the contract, the new Town Center District zoning ordinance, as Ordinance No. 6, Series of 1976. The city council simultaneously amended the ordinance to apply Town Center District zoning to DTC–South pursuant to Ordinance No. 7, Series of 1976. DTC–South thereby became subject to the provisions in Ordinance No. 6. On March 8, 1976 the city passed Resolution No. 7, adopting the Master Development Plan of DTC–South as part of the city's overall Master Plan. The plan had been prepared by James Bowers and Associates on behalf of DTC.

DTC voluntarily dismissed without prejudice its lawsuit challenging the annexation ordinance on March 22, 1976. Soon after that date, DTC and its successors commenced development of DTC–South pursuant to the then most current amended MDP.

The gravamen of plaintiffs' complaint is that since 1981 the city has engaged in conduct in derogation of plaintiffs' rights under the contract and Ordinance No. 6.[7]

## SUMMARY JUDGMENT

Plaintiffs' move for an order of partial summary judgment that:

1. The MDP appended to the parties contract as exhibit A, and subsequent amendments, are merely flexible planning documents designed to establish general guidelines for the development of DTC–South and are not binding on the parties;

2. Neither the MDP, nor subsequent amendments, limit plaintiffs' development rights established in the contract and Ordinance No. 6;

3. Pursuant to the contract and Ordinance No. 6, plaintiffs can unilaterally amend the MDP, as long as such amendments are consistent with the mandatory provisions of Ordinance No. 6; and

4. Pursuant to the contract and Ordinance No. 6's 40/40/30 development formula, the plaintiffs must reserve 5,564,078 square feet of open space, may develop building ground coverage and parking structure surface area to 7,418,771 each, and may develop total gross floor area up to 22,256,313 square feet.

City defendants oppose plaintiffs' motion for summary judgment and move for an order of partial summary judgment that:

1. The 1976 Master Development Plan is a binding agreement which limits development of DTC–South to 11,220,000 square feet; and

2. Plaintiffs have no right unilaterally to amend the MDP either because a) the amendment power belongs to the city or b) MDP amendment requires the mutual consent of the parties.

These cross motions surface the primary issue in this suit: Whether DTC–South can be developed by plaintiffs up to 22 million square feet restricted only by the 40/40/30 formula of Ordinance No. 6.

## STANDARDS OF DECISION

The threshold issue is whether summary judgment is appropriate. Summary judg-

---

7. Plaintiffs allege that such conduct by the city defendant consists of:

a) assertions of a right to approve, modify or reject MDP amendments and revisions despite plaintiffs' compliance with Ordinance No. 6;

b) refusals to issue building permits despite plaintiffs compliance with Ordinance No. 6;

c) refusals to recognize plaintiffs' right to shift the location and density of uses within various "superblocks" despite plaintiffs' compliance with Ordinance No. 6;

d) assertions that DTC–South development is limited to 11.2 million square feet and density levels of the 1976 MDP;

e) assertions of a right to superimpose additional planning and development requirements

through the amendment of Ordinance No. 6, notwithstanding its contractual obligations;

f) issuance of public statements successfully calculated to interfere with plaintiffs' prospective business advantages and existing contractual relations;

g) intentional delay in the issuance of building permits, despite plaintiffs' compliance with Ordinance No. 6's requirements relating to the issuance of building permits; and

h) unilateral passage of Ordinance No. 11, Series of 1982 and Resolution No. 21, Series of 1983, establishing an MDP amendment procedure inconsistent with the contract and Ordinance No. 6.

ment pursuant to Fed.R.Civ.P. 56 is a drastic remedy, *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir.1973), which is appropriate only where there exists no genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–159, 90 S.Ct. 1598, 1608–1609, 26 L.Ed.2d 142 (1970); *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1383 (10th Cir.1980). Nevertheless, it has been held that the filing of cross motions for summary judgment which advance divergent constructions of the parties' contract, is amenable to summary disposition. *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690 (10th Cir.1981).

As in the present case, the parties in *Harrison Western* cross moved for summary judgment, representing that the absence of genuine issues of material facts rendered summary disposition appropriate. The parties and the court agreed that the litigation turned upon the construction of a particular contract provision. As such, the court had to reconcile the not necessarily compatible standards for summary judgment with the canons of contract construction; the same task presently before me.

In support of their summary judgment motions, the *Harrison Western* litigants submitted documentary evidence extrinsic to their contract. Construing all pleadings, affidavits and documents in favor of the non-movant, this evidence established genuine issues of material fact which would have precluded summary resolution. The court in *Harrison Western*, however, recognized that

> "[i]f the terms are clear, the intent of the parties must be ascertained from the contract itself … (and) … [i]f the contract is unambiguous, construction of the contract is a question of law and summary judgment is appropriate."

*Id.* at 695 (citations omitted). "[B]ecause of the plainness of the words and the lack of ambiguity in the work", *Id.* at 697, the Tenth Circuit upheld the trial court's granting of summary judgment without consideration of various factual issues created by evidence extrinsic to the contract.

In the present case, as in *Harrison Western*, if the parties contract is unambiguous, its construction is amenable to summary resolution without resort to evidence extrinsic to the document itself. Extrinsic evidence is relevant only if, after examination of the entire agreement, the terms are ambiguous. *Union Rural Electric Association v. Public Utilities Commission*, 661 P.2d 247, 251 (Colo.1983).

Whether a contract is ambiguous is a question of law for the court. *Id.* at 251; *See also Gran Prix Imports v. Buckley Bros. Motors, Inc.*, 633 P.2d 1085 (Colo. App.1979), *rev'd on other grounds*, 633 P.2d 1081 (Colo.1981). The following principles will guide my decision: "A contract [provision] is ambiguous only if it is reasonably and fairly susceptible of more than one meaning; the fact that the parties disagree as to the meaning does not establish ambiguity." *Harrison Western*, 662 F.2d 690, 695. *See also Union Rural*, 661 P.2d 247, 251. In ascertaining whether certain contract provisions are ambiguous, the language used must be construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all provisions of the agreement. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 577 P.2d 748, 750 (1978). Words and expressions used in lawyer-prepared instruments are to be given their legal connotation. *Malbone Garage v. Minkin*, 272 App.Div 109, 72 N.Y.S.2d 327 (1947), *aff'd* 297 N.Y. 677, 76 N.E.2d 331 (1947). Extrinsic evidence will not be admitted to create an ambiguity where none otherwise existed. *In Re Marriage of Blair*, 649 P.2d 344, 345 (Colo.App.1982).

### A. The 1976 Master Development Plan is a Non-Binding Advisory Document

■ I conclude that the parties 1975 Memorandum Agreement presents no ambiguity as to whether the MDP is a binding document which limits plaintiffs' development of DTC South. Summary resolution, therefore, is appropriate. The memorandum agreement, considered with its exhib-

its "A" and "B", the MDP and Ordinance No. 6, Series of 1976, respectively, unambiguously establishes that DTC–South may be developed to 22 million square feet. A step by step analysis of the pertinent provisions of the contract establishes that no ambiguity exists and that, as a matter of law, plaintiffs' development of DTC–South is limited only by the mandatory provisions of Ordinance No. 6, Series of 1976.

That the MDP was only intended to be advisory and not binding on the parties is evinced by § 2 of the contract, *Comprehensive Plan*, which states that

The City recognizes that it is the intent of DTC to develop the property in a manner *generally* consistent with the Master Development Plan attached hereto as "Exhibit A", and incorporated herein by reference.

(Emphasis added.) The use of the term "generally" illustrates the parties' intent that the MDP not be binding. Rather, the parties viewed the MDP as a non-enforceable model or guide. To construe this provision as requiring strict adherence to the MDP would render the word "generally" at best superfluous and at worst plainly inconsistent with the language's clear meaning. It is axiomatic that "each word in an instrument is to be given meaning...". *Ramsey v. Nordloh,* 143 Colo. 526, 354 P.2d 513 (1960); *see also, BA Mortgage Co., Inc. v. Unisal Development, Inc.,* 469 F.Supp 1258 (D.Colo.1979). The plain meaning of "generally" is "in disregard of specific instances and with regard to an overall picture". Webster's New Collegiate Dictionary (1977). City defendants' construction, that DTC–South's development must be specifically consistent with the MDP, is impermissible in light of the "general", non specific language chosen by the parties.

Section 2 of the contract, *Comprehensive Plan*, continues, to state that

... furthermore, the City declares that said [Master Development] Plan for the property is hereby adopted, ratified and approved in all respects *as a part of the City's Master Plan.* Accordingly, the Master Development Plan attached as "Exhibit A" shall be made a part of the City's overall Master Plan as it applies to the Property by the City's ordinance or resolution, as appropriate, promptly following annexation of the property.

(Parenthetical phrase and emphasis added.) This language unequivocally makes the MDP, "in all respects", part of the City's Master Plan. City defendants spend a great deal of effort distinguishing the MDP from the Master Plan despite the agreement clearly providing for the subsumation of the MDP by the Master Plan. City defendants anomalously contend that the component MDP is binding despite the entire Master Plan being merely advisory. If, as the contract provides, the MDP is part of the Master Plan, the MDP can have no greater effect than the Master Plan. The Town Center district is a microcosm of the larger community and the MDP is to the Town Center District what the Master Plan is to the City. City defendants contend that the similarity between "Master Development Plan" and "Master Plan" is mere fortuity; that it is purely coincidental that two words in each term are identical. Mere coincidence is an inadequate explanation. A more reasonable explanation of the similarity in the terms is that each fundamentally expresses the same concept. To rule otherwise suggests that the contracting parties were engaged in nothing more than an exercise in glossolalia.

Giving the language of § 2 its plain meaning the MDP is subsumed in the Master Plan and has no legal incidents different or greater than the Master Plan's. The Master Plan, despite city defendant's protestations, is clearly a non-binding advisory document.[8]

When a legal term such as "master plan" is used in a lawyer-prepared document,

---

**8.** In the previous opinion in this matter, *Geralnes,* 583 F.Supp. 830, 837, I denied city defendants's motion to dismiss and held that the MDP was a non-binding document. This conclusion, however, was reached in part by taking the allegations of the complaint as true and construing them in a light most favorable to plaintiffs. *See Bryan v. Stillwater Board of Realtors,* 578 F.2d 1319, 1321 (10th Cir.1977); *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976); C.

that term is given its legal meaning. *Mal-bone Garage v. Minkin*, 272 App.Div. 109, 72 N.Y.S.2d 327 (1947), *aff'd*, 297 N.Y. 677, 76 N.E.2d 331 (1947). *Theobald v. Bd. of County Commissioners*, 644 P.2d 942 (Colo 1982), specifically discusses the legal incidents of a master plan in great detail. The state district court in *Theobald* invalidated Summit County, Colorado's master plan adopted pursuant to Colo.Rev.Stat. 30–28–101 *et seq.* (1973), holding that it was an improperly adopted and unconstitutional zoning measure. The Supreme Court of Colorado reversed, holding that the trial court's invalidation of the master plan was unnecessary as the master plan's effect was merely advisory and non-binding. Noting that the "Colorado statutory scheme distinguishes between the two functions [of planning and zoning]. *See* section 30–29–101 *et seq.*, C.R.S. 1973", *Id.*, 644 P.2d at 948, the court held that

> The master plan is the planning commission's *recommendation* of the most desireable use of the land . . . Conceptually, a master plan is a guide to development rather than an instrument to control land use . . . On the other hand, it is the task of the legislative body charged with zoning to individually apply the broad planning policies to specific property, consistent with the public interest, and the notions of due process and equal protection . . . [T]he [master] plan embodies policy determination and guiding principles; the zoning ordinances provide the detailed means of giving effect to those principles . . . the master plan itself is only one source of comprehensive planning, and is generally held to be advisory only, and not the equivalent of zoning, nor binding upon the legislative body.

*Id.*, 644 P.2d 948, 949 (emphasis added).

Defendants attempt to impute the effect of zoning to the MDP and to distinguish

the MDP from the statutory master plan is disingenuous. The MDP was never zoned, but only incorporated into the non-binding master plan. Resolution No. 7, Series of 1976 in which the city adopted the MDP was not a zoning ordinance and, therefore, has no legally binding effect. Exhibit B of the contract, the new Town Center District zoning plan, adopted by the city as Ordinance No. 6, Series of 1976 was, however, promulgated with deference to the due process concerns which informed the *Theobald* decision. Only Ordinance No. 6, with its allowance of development up to 22 million square feet, has the binding force of properly enacted zoning.

The master plan itself, to which the MDP was appended, was created pursuant to Colo.Rev.Stat. § 31–23–201 *et seq.* (1977). These statutes apply to the creation of master plans by municipalities. The master plan at issue in *Theobald* was created under Colo.Rev.Stat. § 30–28–101 *et seq.*, (1977). The *Theobald* analysis of the legal effect of a county's master plan is, nonetheless, applicable to a municipality's master plan. The purpose and scope of the two statutory schemes are identical and planning and ultimate zoning authority are similarly vested in different bodies. *See* Colo. Rev.Stat. § 31–23–209. Further, in construing the legal effect of a municipality's master plan, the Colorado Supreme Court has held that "A master plan is advisory only as is evidenced by the statutory scheme for creation of municipal planning commissions. Section 31–23–201, *et seq.*, C.R.S. 1973 (1977 Repl. Vol. 12)." *Margolis v. District Court, In and For The County of Arapahoe County*, 638 P.2d 297 (Colo.1981). As well, in a case involving the master plan of Greenwood Village, the very defendants in the present case, it has been held that

Wright & A. Miller, *Federal Practice and Procedure: Civil,* § 1357 at 594 (1969). I also noted that the case law cited by plaintiffs supported their contention that the MDP was not binding. *See Theobald v. Board of County Commissioners, Summit County,* 644 P.2d 942 (Colo.1982); *Margolis v. District Court, In and For the County of*

*Arapahoe,* 638 P.2d 297, 305 (Colo.1981); *Richter v. City of Greenwood Village,* 513 P.2d 241, 242 (Colo.App.1973). Fairness to city defendants, however, requires that I consider anew plaintiffs' contention that the MDP is non-binding, without the influence of any presumptions that are required in a motion to dismiss.

A comprehensive plan is helpful in guiding a coordinated, adjusted and harmonious development of a municipality and its environs, but the plan is still no more than just that—a *plan.*

*Richter v. City of Greenwood Village,* 513 P.2d 241 (Colo.App.1973).

Because city defendant's master plan is clearly only advisory, the MDP, incorporated therein, is similarly limited.

Further evidence that the parties intended the construction set forth in this opinion may be found in § 3 of the contract, *Zoning and Platting.* Section 3(A) states that

Within forty-five (45) days following execution of the Agreement, the City agrees to amend its existing zoning ordinance by totally repealing the present Town Center District zone in its entirety and re-enacting in its entirety the Town Center zone as the same appears in Exhibit "B" attached hereto and incorporated herein by this reference.

"Exhibit B", of course, ultimately became Ordinance No. 6, Series of 1976 under which plaintiffs claim their rights to develop DTC–South up to 22 million square feet.

Section 3(B) states that

The City recognizes that the orderly development and use of the Property, as set out in the Master Development Plan, attached as Exhibit "A", will occur over a period of many years. However, the City recognizes that the development of a "Town Center" in accordance with the Town Center zone category requires that the zone category attach to the property promptly and continue without modification during the periods when the annexation of the property is subject to court review. Accordingly, within forty-five (45) days of annexation of the Property, the City shall adopt town center zoning for the Property in accordance with Exhibits "A" and "B".

The structure of the contract's § 3 illustrates the parties' intent that "Exhibit B"/Ordinance No. 6, be binding while "Exhibit A"/the MDP be merely advisory. The re-zoning needed to effectuate the agreement is set forth in § 3(a). The pur-

pose of that sub-section is to express precisely what rezoning is necessary to reflect the parties agreement. This sub-section is without reference to the MDP as part of the necessary re-zoning. Section 3(B), however, which does refer to the MDP, does not contain any substantive zoning requirements. Rather, its primary purpose is to emphasize the need for rezoning DTC–South as a "Town Center District" within 45 days of annexation. The "statement of purpose", so to speak, of § 3(B), is advanced in its second sentence: "... the development of a "Town Center" *in accordance with the Town Center Zone category* requires that the zone category attach to the property promptly...". In the zoning scheme, the MDP and its amendment process is a non-binding means of facilitating the "orderly development and use" of DTC–South as a Town Center District. That the MDP was never considered binding is evinced by the fact that the ultimate zoning of DTC–South as contained in Ordinance No. 6 only reflected Exhibit B of the contract and was absolutely void of substantive reference to the MDP.

This agreement may only be reasonably construed if plaintiffs' interpretation is adopted. The new Town Center District zone can only be "in accordance" with both Exhibits A and B if Exhibit A is only advisory and constitutes no limitation upon Exhibit B. It is reasonable to construe that the MDP is merely advisory, a document subject to being changed, and in fact required to be changed, to apprise the city of the current development plans for DTC–South. In this vein, accordance with the MDP keeps the city apprised of currently planned development. Exhibit B/Ordinance No. 6, however, is the sole substance of the new Town Center District zone, setting forth maximum limits on development. Again, this is evidenced by § 3(A), above, which refers soley to Exhibit B. If city defendant's interpretation is accepted, then no rhyme nor reason exists for the sole inclusion of Exhibit B in § 3(A), or its inclusion anywhere else in the document, for that matter. The inclusion of Exhibit B

makes sense only if Exhibit A is non binding, otherwise Exhibit B serves absolutely no purpose. If 11.2 million square feet is the maximum that can be developed, then Ordinance No. 6's 40/40/30 formula allowing development to 22 million square feet is mere surplusage. Exhibit A, on the other hand, serves a distinct and important advisory function even if it is not binding. It is well established that statutes and contracts will be construed to give distinct meaning to each of their provisions. *Gandy v. Park Nat'l Bank*, 200 Colo. 298, 615 P.2d 20, 22 (1980); *Griffin v. United Bank of Denver*, 198 Colo. 239, 599 P.2d 866 (1979); *Ramsey v. Nordloh*, 143 Colo. 526, 354 P.2d 513 (1960); *BA Mortgage Co., Inc. v. Unisal Development, Inc.*, 469 F.Supp. 1258, 1263 (D.Colo.1979).

If all provisions of the parties' agreement are to be given effect, there is only one way to interpret it: The MDP is a non-binding advisory document and the 40/40/30 formula of Ordinance No. 6 controls the development of DTC–South.

A review of Exhibit B/Ordinance 6 supports my construction as well. As noted above, the Town Center district zone of Ordinance No. 6, Series of 1976 was applied to DTC–South pursuant to Ordinance No. 7, Series of 1976. Ordinance Nos. 6 and 7, the actual relevant zoning legislation, is void of reference to the MDP as a limitation on development.

Ordinance No. 6's § 3, *Planning Requirements*, provides, in its relevant part, that a Town Center District zone's a) building ground coverage shall not exceed 40% of the gross acreage within the district, b) surface area of structure parking shall not exceed 40% of the gross acreage within the district, c) "open space" shall not be less than 30% of the gross acreage within the district, and D) gross floor area shall not exceed three times the maximum building ground coverage. It is this section which sets forth the 40/40/30 requirement and the maximum floor area to gross acreage ratio of 1.2:1, (i.e. 3 times 40% of all acreage within the district equals 1.2 square feet of floor area for each square foot of

land within the district). The total acreage of DTC–South is 425.779 acres. 40% (maximum building ground coverage) of this figure = 170.31 acres or 7,418,771 square feet. Since the gross floor area may be as much as three times the amount of permitted building ground coverage, DTC–South may be developed to 22,256,313 square feet. 40/40/30, 1.2:1 is the sole limitation on development, to the exclusion of the MDP.

The MDP is not mentioned at all in Exhibit B/Ordinance No. 6 until § 4(b), *Procedure and Fees* which provides as follows:

Information Required: The following information is required of the owner(s) before rezoning can be considered:

(1) Legal description of the property to be rezoned.

(2) The Master Development Plan shall show existing land uses, zoning, building floor area, parking areas, open space and the ratios thereof. The plan shall also show ultimate land uses and gross floor areas of office, residential, support and other uses and their mix or integration in the total Town Center District, with probable apportionment of each within each major land area. The plan shall include information about the proposed transportation network.

As noted above with respect to the contract, if, as city defendants suggest, the acreages exhibited in the MDP are given binding effect, then the express 40/40/30, 1.2:1 development maxima of the previous § 3 would be superfluous. Attaching meaning to the MDP, in its context, and the 40/40/30, 1.2:1 formulae in their context, renders my construction the only reasonable one. Section 4(b)'s informational requirements are necessary for the city to determine if the land sought to be rezoned as a Town Center District is amenable to such zoning and whether the proposed development is within the maxima of Ordinance No. 6. As explained above, the MDP is a means of achieving orderly development of the new Town Center District zone.

Ordinance No. 6's § 5, *Administration,* also supports my construction. It provides that the city *shall* approve building permits upon demonstration that the request is consistent with the most currently amended MDP, yet available acreage and structural mass reserves, and city building codes:

a) The Planning and Zoning Commission Staff and developer shall maintain current and accurate records of maximum building ground coverage, maximum parking ground coverage, minimum open space, existing development at the time of rezoning, total gross land area, the land remaining for development and other minimum and maximum requirements of the Town Center District. The City shall approve each request for building permits upon specific demonstration by the developer that the request is consistent with:

(1) The most currently amended Master Development Plan.

(2) Yet available acreage and structural mass reserves.

(3) City Building Codes.

The only plausible explanation for development having to be consistent with both the 40/40/30 formula and the MDP is that the MDP is a flexible, advisory document. The developer is bound by the MDP to the extent that the application for building permits be consistent with his plans for development as set forth in his previously submitted MDP. Recall that the original MDP was drafted by plaintiffs and submitted in conjunction with contract negotiations. The purpose of development having to be consistent with the "most currently amended" MDP is to avoid the situation where the city, which has to provide services, has no idea of what and how much will be required of it. Requiring development to be consistent with the MDP until it is amended, allows for the city to budget its resources to meet its service obligation. *See,* e.g. § 4 of the contract, *Roads and Streets.*

City defendants assert that Ordinance No. 6, § 5(a)'s requirement that building permit applications be consistent with the MDP and also with yet available acreage and structural mass reserves, (i.e. 40/40/30, 1.2:1) requires that the MDP be determined to be a binding document. Otherwise, city defendants argue, MDP is mere surplusage. City defendants fail to recognize, however, that the MDP, like a city's master plan serves the purpose of advising the city of planned development; it is not mere surplusage. The MDP is not, as city defendants would have me believe, either worthless or binding. The city is permitted to deny building permits of which it was not generally apprised in the MDP so as to facilitate the orderly development of the DTC–South Town Center District.

Finally, I note that there is no dispute that the new Town Center District zoning ordinance deleted from the old Town Center District zoning ordinance the requirement of a minimum of square footage reserved for residential use. The parties have assumed there to be no residential square foot requirements in the course of their performance of the contract and in the course of the present litigation. Nowhere do city defendants argue that there are still residential building requirements. Yet the MDP provides for 1,380,000 square feet of residential floor area. If the parties intended the MDP to be binding, then why have not these residential building requirements been met? If the MDP is binding then why is not the city arguing that plaintiffs are contractually obligated to build these residences? That the MDP was never intended to be a binding document is reflected in the dissimilarity between the MDP with respect to residences and the actual development of DTC–South. The residences noted in the MDP have never been built because the MDP is a non-binding advisory document.

### B. *Master Development Plan Amendment Procedure*

■ The parties' 1975 Memorandum Agreement is an odd and inartfully drafted document. While, as discussed above, it unambiguously establishes that the MDP is no substantive limitation on development,

the MDP is not without purpose. Its purpose is to provide the city with a reasonable forecast of the nature and level of development that would occur on DTC–South in the near future. The city's right and need for apprisal is manifest given its service obligations and police power to keep development within zoning Ordinance No. 6. It is clear that keeping the city apprised of development plans, by way of a current MDP, is plaintiffs' obligation. Ordinance No. 6, which is part of the contract, in §§ 4 and 5, *Procedure and Fees* and *Administration*, respectively, includes consideration of the MDP in zoning an area as a Town Center District and in issuing a building permit within a Town Center District. The ordinance is unclear, however, as to how plaintiffs' duty of apprisal is discharged. The contract is clear that plaintiffs may change their development plans as long as they are consistent with Ordinance No. 6 and as long as the city is kept abreast of plaintiffs' new plans. If the city is not re-apprised of plaintiffs' development plans, a building permit may be withheld. The contract is ambiguous, however, as to how the plaintiffs apprise the city, through amendment of the MDP, of their change in development plans.

Plaintiffs claim they have a unilateral right to amend the MDP with the city's right to review limited to a determination of compliance with the mandatory provisions of Ordinance No. 6. City defendants maintain that either they have the sole right to amend or, in the alternative, that amendment may only occur with the parties' mutual consent. Because the contract is ambiguous, I must resort to extrinsic evidence to determine the contracting parties intent with respect to amendment of the MDP.

A review of the evidence submitted in support of the present cross motions for summary judgment, indicates the presence of a genuine issue of material fact as to the precise MDP amendment procedure contemplated by the parties. I reach this conclusion reluctantly with the stringent standards of summary judgment in mind., i.e. construing all pleadings, affidavits, etc. in a light most favorable to the non-movant.

Because of this standard of decision, I can not hold, as a matter of law, that any party's construction reflects its intent at the time of contracting. The contract, Ordinance No. 6 and plaintiffs' supporting affidavits strongly establish prima facie that the MDP is for the most part a formality subject to plaintiffs' unilateral amendment within the parameters of Ordinance No. 6. That the new Town Center District zoning legislation, Ordinance No. 6, deletes all provisions contained in the old Town Center District zoning legislation, Ordinance No. 2, Series of 1975, pertaining to the City's 1) semi-annual review and approval of the MDP and "general plans" of DTC–South development; 2) approval of any land use not specified in the MDP; and 3) involvement of its Planning and Zoning Commission in planning and development of DTC–South, is strongly suggestive of plaintiffs' position. A strong suggestion, however, is insufficient to support a summary judgment. City defendants' affidavits, depositions, etc. raise issues of intent best reserved for the trier of fact or to the parties for an intelligent settlement.

Accordingly, it is hereby ordered that:
1) Plaintiffs' motion for summary judgment that

a) The 1976 Master Development Plan, and subsequent amendments, for DTC–South are flexible planning documents designed to establish general guidelines for development and are not binding on the parties is Granted;

b) Neither the MDP nor its amendments limit the rights established in the 1975 contract or Ordinance No. 6, Series of 1976 is Granted;

c) Pursuant to the terms of the contract, Ordinance No. 6 and Ordinance No. 7, Series of 1976, building ground coverage within DTC–South shall not exceed 40% of the gross acreage within DTC–South or 7,418,-771 square feet; surface parking and the surface area of structure parking within DTC–South shall not exceed 40% of the gross land area within DTC–South or 7,418,771 square feet; a minimum of 30% of the gross acreage within DTC–South or 5,564,078 square feet, shall be reserved for

and used as open space; and the gross floor area for DTC–South shall not exceed three times the maximum building ground coverage, or 22,256,313 square feet, is Granted;

d) Pursuant to the contract, Ordinance No. 6 and Ordinance No. 7, Series of 1976 plaintiffs' may unilaterally amend the Master Development Plan within the parameters of Ordinance No. 6 without any participation by city defendants is Denied;

2) City defendant's motion for summary judgment that

a) The 1976 MDP is a binding limitation on development is Denied;

b) The plaintiffs' have no unilateral right to amend the MDP either because (1) the amendment power belongs to the city, or (2) amendment requires mutual consent is Denied.